UNITED STATES of America, Plaintiff,

v.

Abdula ILAZI, Defendant.

Cr. No. 3–83–21.

United States District Court, D. Minnesota.

May 13, 1983.

James M. Rosenbaum, U.S. Atty., Joseph T. Walbran, Asst. U.S. Atty., Minneapolis, Minn., for plaintiff.

Robert J. Sorensen, Thomson & Hawkins, St. Paul, Minn., for defendant.

## MEMORANDUM & ORDER

DEVITT, Senior District Judge.

This matter is before the court on defendant's renewed motion to suppress the fruits of a search conducted on January 31, 1983 at the Minneapolis-St. Paul International Airport.

### I

On January 31, 1983 at the Minneapolis-St. Paul International Airport, Special Agent Olby and Officer Mortensen observed two adult males, later identified as the defendant Abdula Ilazi and Islam Pinjoli, as two of the last passengers to exit an airplane from West Palm Beach, Florida.

Agent Olby and Officer Mortensen observed that both individuals appeared physically impaired; they had glassy eyes, walked very slowly, and staggered. At one point when Agent Olby was in close contact with Pinjoli, Agent Olby did not smell alcohol. Both individuals placed their fingers on the side of their nose and sniffed and inhaled deeply. Both individuals repeatedly looked over their shoulders at other passen-

gers and the agents. Defendant continually stomped both feet as if to pack something farther into his boots.

At this point Special Agent Lewis joined Agent Olby and Officer Mortensen and was briefed. Shortly thereafter Pinjoli left defendant at the bar where they had been sitting and walked about the airport, repeatedly looking back at Agent Olby and Officer Mortensen. Agent Olby and Officer Mortensen approached Pinjoli, identified themselves as police officers, inquired if they could ask a few questions and advised him he was not under arrest and was free to go. The ensuing conversation revealed that Pinjoli was an alien who did not have a passport or immigration card with him and who had bought with cash a round trip airline ticket from Alaska to Florida on January 30, 1983, with an open return. Pinjoli also stated that defendant also was an alien.

At the agents' request Pinjoli returned to the bar area. While waiting outside the bar area Officer Mortensen observed Pinjoli stop at the doorway of the bar, grab his right ankle, pat it, and stomp his foot while looking at defendant. Pinjoli looked to see if Agent Olby and Officer Mortensen could see him. Soon after Agent Lewis saw defendant acknowledge Pinjoli and do something with his lower leg or foot.

Defendant got up and walked with Pinjoli to Agent Olby and Officer Mortensen. Agent Olby informed defendant that he was not under arrest and was free to go and then asked for identification. Defendant produced an Immigration and Naturalization Service (INS) document stating he must depart the United States on or before February 18, 1983. At Agent Olby's request, defendant produced his airline ticket issued under the name of John Ilazi, paid for with cash, for a round trip flight from Alaska to Florida on January 30, 1983, with an open return. Also at Agent Olby's request, defendant produced an Alaska driver's license issued under the name of Abdula Ilazi. As Defendant handed the driver's license to Agent Olby, the agents observed that defendant's hands were trembling.

When Agent Olby asked defendant if he had any narcotics or large amounts of United States currency, defendant's face began to tremble and his hands began to shake. The conversation also revealed that defendant did not have any luggage. Agent Olby and Officer Mortensen then thanked defendant and Pinjoli for their cooperation and departed.

Agent Olby and Officer Mortensen were then joined by Agents Lewis and Kramer who were briefed on the contact.

As defendant and Pinjoli left the bar, Agents Lewis and Kramer noticed that defendant walked as if he were "a two-year-old child with a dirty diaper." Agents Lewis and Kramer approached defendant and Pinjoli to inquire regarding their immigration status, identified themselves as federal agents, and asked if they could speak to them. Defendant and Pinjoli stopped and faced the agents.

In response to Agent Lewis' request to see defendant's travel papers, defendant handed Agent Lewis his airline ticket, driver's license, and the INS document. Pinjoli said his papers had been stolen and identified defendant as his travelling companion.

In response to Agent Lewis' inquiry, both individuals said they were from Yugoslavia, did not have any immigration papers, and did not have any luggage. Agents Lewis and Kramer then noticed that the zipper on defendant's right boot was unzipped to approximately one inch from the bottom of the boot and that there was a large bulge under defendant's sock. Agent Lewis reached to pat the bulge to determine if it had the contour of a weapon. Defendant jumped back as Agent Lewis touched his boot. Agent Lewis then said "Let's go."

Agents Lewis and Kramer were joined by Agent Olby and Officer Mortensen. After being told to follow Pinjoli up a stairway leading to the Bureau of Criminal Apprehension Office (BCA), defendant attempted to flee. Agents Lewis and Olby tried to stop defendant and escort defendant up the stairs. Defendant became so uncontrollable that Agent Lewis had to display his sidearm to effectuate defendant's compliance.

During a patdown in the BCA office, two bags of cocaine were found in defendant's boots. Defendant and Pinjoli were then advised of their rights. During a subsequent strip search, another bag of cocaine was found in defendant's briefs.

Defendant was charged with one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). On March 14, 1983 this court denied defendant's motion to suppress the evidence obtained during the search. On April 11, 1983 defendant waived his right to jury trial and filed a stipulation of facts upon which the court was to determine defendant's guilt or non-guilt. Defendant also renewed his motion to suppress citing a recently decided United States Supreme Court case, *Florida v. Royer*, ⸺ U.S. ⸺, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

## II

In the context of the Fourth Amendment the Supreme Court has identified three categories of police-citizen encounters. First, communication between police and citizens involving no detention or coercion. This kind of encounter does not constitute a "seizure" and therefore no objective justification is required. *Florida v. Royer*, ⸺ U.S. ⸺, 103 S.Ct. 1319, 1323–24, 1332–33, 1337–38 n. 3, 75 L.Ed.2d 229 (1983) (White, J., joined by Marshall, J., Powell, J., and Stevens, J.; Blackmun, J., dissenting; Rehnquist, J., dissenting, joined by Burger, C.J., and O'Connor, J.); *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 1876–77, 1880 n. 1, 64 L.Ed.2d 497 (1980) (Stewart, J., joined by Rehnquist, J.; Powell, J., concurring, joined by Burger, C.J., and Blackmun, J.); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1879 n. 16, 1886, 20 L.Ed.2d 889 (1968) (Warren, C.J.; White, J., concurring). Second, investigative stops involving a brief detention. This kind of encounter constitutes a "seizure" and therefore must be supported by a reasonable suspicion that criminal activity is afoot. *See, e.g., Royer*, 103 S.Ct. at 1324–25; *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 2578–81, 45 L.Ed.2d 607

(1975). Third, full-scale arrests that must be supported by probable cause. *See, e.g., Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (are facts and circumstances sufficient to warrant a prudent person in believing that the person had committed or was committing an offense); *United States v. Slupe*, 692 F.2d 1183, 1188 (8th Cir.1982); *United States v. Regan*, 525 F.2d 1151, 1155 (8th Cir.1975).

Three recent United States Supreme Court cases apply these principles in the context of airport searches and seizures. *Florida v. Royer*, ⸺ U.S. ⸺, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

In *Mendenhall* a young woman who was the last to leave a plane that had arrived from Los Angeles, a "target city"—one that is a major center for the import and export of illegal drugs, was observed scanning the area, had no luggage, walked very slowly, appeared very nervous, and changed flights en route. Based on this information DEA agents approached her, identified themselves as federal officers and asked to see her ticket and some identification. She produced a driver's license and an airline ticket. The ticket showed she had been in California only two days and that the name on the ticket was different from the name on the license. When the agents specifically identified themselves as federal narcotics agents she became very shaken and could hardly speak. The agents returned her ticket and driver's license and asked her if she would accompany them to a nearby office. Although providing no verbal response, she went with the agents and subsequently consented to a search that produced two packages of heroin. 100 S.Ct. at 1873–74.

The district court denied Mendenhall's motion to suppress and she was subsequently convicted. The Court of Appeals for the Sixth Circuit reversed the conviction, and the Supreme Court reversed the Court of Appeals. *Id.* 100 S.Ct. at 1874–75, 1880.

Justice Stewart, announcing the judgment of the Court and writing an opinion joined by Justice Rehnquist found that no seizure had occurred when defendant was approached by the agents, asked for identification, and asked a few questions. Justice Stewart and Rehnquist also found that defendant's consent to going to the office and to the search was free and voluntary. *Id.* 100 S.Ct. at 1873–80.

Justice Powell filed a separate concurring opinion that was joined by the Chief Justice and Justice Blackmun. These justices stated that the issue of whether defendant had been "seized" when asked for identification and her ticket was a close one, but found that there was reasonable suspicion for the stop and that defendant's consent was free and voluntary. *Id.* 100 S.Ct. at 1880–83. Justice White, in a dissenting opinion joined by Justices Brennan, Marshall and Stevens, assumed that there had been a "seizure" when defendant was stopped by the DEA agents, and found that the facts and circumstances in this case did not supply reasonable suspicion to justify the stop. *Id.* 100 S.Ct. at 1883–89.

Consequently a majority of the *Mendenhall* Court held that reasonable suspicion exists to warrant a stop when a person: 1) arrives from a "target city," 2) is one of the last passengers to leave the plane, 3) scans the area as leaving the plane and proceeding through the airport, 4) walks very slowly, 5) appears nervous, 6) has no luggage, and 7) changes flights en route. *See Royer,* 103 S.Ct. at 1327–28, n. 9, 1329, n. 1 (White, J., joined by Marshall, J., Powell, J., and Stevens, J.; Powell, J., concurring).

In *Royer,* a casually-dressed young man at the Miami International Airport had purchased a one-way ticket to New York City with cash, appeared pale and nervous, was looking around at other people, and was carrying luggage that appeared to be heavy and that had an identification tag bearing only the name "Holt" and the destination "LaGuardia." Based on this information two detectives approached him and asked if they could speak with him. Upon request Royer produced his airline ticket and his

driver's license. The baggage identification tags bore only the name "Holt," while the driver's license bore the name "Royer." Royer became noticeably more nervous after being asked about the discrepancy and was told by the detectives that he was suspected of transporting narcotics. The detectives did not return his ticket or driver's license and asked if he would accompany them to a nearby room. Royer said nothing but went with the officers. Without Royer's consent one of the detectives retrieved his luggage and brought it to the room. When asked if he would consent to a search of the suitcases, Royer said nothing but produced a key and unlocked one of the suitcases. Drugs were found. When asked if he objected to a search of the second suitcase, Royer said "No, go ahead." The second suitcase was opened and marijuana was found. Royer was then told he was under arrest. 103 S.Ct. at 1321–22.

The Florida trial court denied Royer's suppression motion and he was subsequently convicted. The Florida District Court of Appeals reversed the conviction, and the Supreme Court affirmed. *Id.* 103 S.Ct. at 1322–23.

Justice White, announcing the judgment of the Court, and writing an opinion that was joined by Justices Marshall, Powell, and Stevens, found that based on these facts there were adequate grounds for suspecting Royer of carrying drugs and temporarily detaining him and his luggage while attempting to verify or dispel their suspicions. In particular these justices found that reasonable suspicion was supplied by the following facts: 1) travelling under an assumed name, 2) paying cash for a one-way ticket to a "target city," 3) checking bags with only a last name and the destination, and 4) acting nervous. *Id.* 103 S.Ct. at 1321–29.

However, these justices found that the limits of a *Terry*-type stop had been exceeded. The detectives retained possession of his ticket and driver's license, seized his luggage and failed to inform him he was free to go. In short, these justices found that the detectives had effectively arrested

Royer and that the facts establishing reasonable suspicion were not sufficient to support a finding of probable cause. *Id.* 103 S.Ct. at 1326–29.

In addition, these justices found that at the time Royer consented to the search of his luggage probable cause to arrest him did not exist. In particular these justices found that a 1) nervous young man 2) with two heavy bags 3) who paid cash for an airline ticket 4) to a "target city" 5) which led to an inquiry that revealed the ticket had been purchased under an assumed name did not supply probable cause for an arrest. *Id.* 103 S.Ct. at 1329.

Justice Brennan, concurring in the result, was of the opinion that the initial stop was illegal and that even if the stop was legal, subsequent actions exceeded the permissible bounds of *Terry* and its progeny. *Id.* 103 S.Ct. at 1330–32.

Justice Blackmun, writing a dissenting opinion, stated that the initial stop was fully supported by reasonable suspicion and that probable cause for the search, although lacking in this case, was not required because there was free and voluntary consent. *Id.* 103 S.Ct. at 1332–36. Justice Rehnquist, writing a dissenting opinion joined by the Chief Justice and Justice O'Connor, stated that the facts in this case established probable cause as well as reasonable suspicion. *Id.* 103 S.Ct. at 1336–42.

Consequently a majority of the *Royer* Court believed there was reasonable suspicion for the stop. However, a different majority found that as a practical matter Royer had been arrested and that such arrest was not supported by probable cause.

Based on the majority holdings in *Mendenhall* and *Royer,* there is reasonable suspicion to stop an individual for investigative questioning in an airport if that person:

1) arrives from or purchases with cash a one-way ticket to a "target city,"

2) scans the area as proceeding slowly through the terminal or is travelling under an assumed name,

3) has no luggage or has luggage that is identified only by a last name and the destination, and

4) appears nervous.

## III

Prior to the first time defendant here was approached, the agents were aware of the following facts: 1) defendant was one of the last passengers to leave a plane that had arrived from a "target city," 2) defendant repeatedly scanned the area as if to see if anyone was looking at him, 3) appeared to be travelling without luggage, and 4) although defendant did not display nervousness, he did have glassy eyes, staggered, walked slowly, and placed his fingers on each side of his nose and sniffed and inhaled deeply, conduct that is consistent with those who use drugs, 5) continually stomped his feet as if to pack something farther into his boot, and 6) defendant's travel companion apparently signaled to the agents that defendant had something in his boot. Therefore, even assuming the encounter constituted a "seizure,"[1] the court

---

1. The Supreme Court has stated "there is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets," *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 2755, 65 L.Ed.2d 890 (Powell, J., concurring, joined by Burger, C.J., and Blackmun, J.); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1876, 1880 n. 1, 64 L.Ed.2d 497 (Stewart, J., joined by Rehnquist, J.; Powell, J., concurring, joined by Burger, C.J., and Blackmun, J.); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (White, J., concurring), and it appears that a "seizure" does not occur until official authority is exercised such that "a reasonable person would have believed he was not free to leave." *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 1326, 1332–33, 75 L.Ed.2d 229 (1983) (White, J., joined by Marshall, J., Powell, J., and Stewart, J.; Blackmun, J., dissenting); *Mendenhall,* 100 S.Ct. at 1877, 1880 n. 1 (Stewart, J., joined by Rehnquist, J.; Powell, J., concurring, joined by Burger, C.J., and Blackmun, J.). However, it is unclear whether asking for identification or an airline ticket converts the encounter into a "seizure" requiring reasonable suspicion. *Compare Royer,* 103 S.Ct. at 1326 *with id.* at 1331 *with id.* at 1334 n. 2 *with id.* at 1337–38 n. 3 *with Reid,* 100 S.Ct. at 2753–54 *with id.* at 2574 *with id.* at 2755 *with Mendenhall,* 100 S.Ct. at

holds that the initial stop was supported by reasonable suspicion of drug trafficking.[2]

*Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) does not suggest a contrary result. In *Reid* the petitioner arrived on an early morning flight from Fort Lauderdale, Florida, a "target city." DEA agents noticed that petitioner did not claim any luggage, and apparently was trying to conceal that he had a travelling companion. The DEA agents approached petitioner and a subsequent consensual search uncovered cocaine. The court held that these facts did constitute reasonable suspicion and therefore the seizure was unlawful. *Id.* 100 S.Ct. at 2753–54 n. 1. The petitioner in *Reid* did not act as if he was a drug user, did not scan the area as he walked through the terminal and did not leave an impression that he was concealing something on his body. Therefore the holding in *Reid* is inapposite here.

■ At the time of the stop, defendant was informed that he was not under arrest and was free to go at any time. After a brief inquiry directed toward confirming or dispelling the agents' suspicions, defendant's identification was returned and the agents departed. Consequently the court holds this encounter did not exceed the limits of a *Terry*-type stop.

The conversation between the agents and defendant provided additional facts: 7) defendant was an alien in a deportable status, 8) was travelling under an assumed name, 9) paid cash for his ticket, 10) stayed in Florida only one day after flying from Alaska, 11) was very nervous and became increasingly nervous when asked about narcotics, and 12) did not have any luggage.

■ Following this conversation, the agents noticed that defendant walked as if he had something hidden in his pants. Deciding to inquire about defendant's immigration status, defendant was again approached by agents. The court holds that this encounter, even assuming it was a "seizure," was supported by reasonable suspicion of drug trafficking and immigration violations.

During this conversation Agent Lewis noticed a bulge in defendant's sock and thought it could be a weapon. *See United States v. Post,* 607 F.2d 847, 851 (9th Cir. 1979) ("It is not unreasonable to suspect that dealer in narcotics might be armed."); *United States v. Milham,* 590 F.2d 717, 721 (8th Cir.1979) (firearms are tools of the trade of drug dealers).

■ Reaching toward defendant's boot, defendant jumped back as Agent Lewis' hand touched defendant's boot. Agent Lewis then said "Let's go." It is conceded that defendant at this point had been arrested and was not free to go. Therefore, the issue is whether this arrest was supported by probable cause.

Based upon the majority holding in *Royer,* a nervous young man with two heavy bags who paid cash for a one-way airline ticket to a "target city" under an assumed name does not establish probable cause for an arrest. *Royer,* 103 S.Ct. at 1329, 1330–33 (White, J., joined by Marshall, J., Powell, J., and Stevens, J.; Brennan, J., concurring; Blackmun, J., dissenting).

In this case, however, there were other facts, not present in *Royer,* indicating crim-

---

· 1876–77 *with id.* at 1880 n. 1 *and id.* at 1885–86. Therefore the court will assume, without deciding, that the encounters with defendant must be supported by reasonable suspicion.

**2.** Defendant suggests that use of the so-called "drug courier profile" is per se improper. Aside from the fact there is no indication that such a profile was relied upon in this case, defendant's contention is in error. The "drug courier profile" is an informal compilation of characteristics developed by federal narcotics officers that are generally associated with drug smugglers. The Supreme Court has not con-

demned the use of drug courier profile but rather has stated that conformity with one or more of the profile traits does not necessarily establish reasonable suspicion. Each case must be judged independently based on the totality of the circumstances in light of the training and experience of the police officer involved. *See Florida v. Royer,* 103 S.Ct. at 1339–40 n. 6 (Rehnquist, J., dissenting); *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980); *United States v. Mendenhall,* 100 S.Ct. at 1881, 1883 n. 6 (Powell, J., concurring).

inal activity. Defendant was constantly looking about to see if anyone was looking at him, his mannerisms were consistent with those who use drugs, he travelled a great distance to a "target city" and returned the next day, he had no luggage, appeared to have something hidden in his pants, continually stomped his feet, his travel companion appeared to be signalling that defendant had something in his boot, he had a large bulge in his sock, and he resisted an attempt to determine if the bulge was a weapon.

Although these facts independent of the others may have been consistent with innocence, the totality of the circumstances indicated that criminal activity was afoot. It also must be remembered that defendant was observed by officers experienced in the detection of drug smugglers. *See Royer,* 103 S.Ct. at 1330 n. 2, 1338–40 & n. 6 (Powell, J., concurring; Rehnquist, J., dissenting, joined by Burger, C.J., and O'Connor, J.) (trained officer can draw inferences from conduct that would elude an untrained person); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (same); *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 2641 n. 2, 61 L.Ed.2d 357 (1979) (same).

The court concludes that the facts and circumstances of this case were sufficient to justify a reasonable and prudent person to believe that defendant had committed or was committing a violation of the law. Consequently, there was probable cause for the arrest and subsequent search. *See United States v. Elsoffer,* 671 F.2d 1294 (11th Cir.1982) (large bulge in pants along with other facts supplied probable cause); *United States v. Peep,* 490 F.2d 903 (8th Cir.1974) (large bulge in pants and resistance of patdown, considering totality of circumstances, provided probable cause).

Upon reconsideration, IT IS ORDERED that defendant's motion for suppression be DENIED.

### ORDER

This matter came on for trial before the court on April 11, 1983 based on a one-count indictment charging defendant with possession with intent to distribute 223.32 grams of cocaine in violation of 21 U.S.C. § 841(a)(1).

On April 11, 1983 defendant waived his right to a jury trial and filed a stipulation of facts upon which the court was to determine defendant's guilt or non-guilt. Based upon that stipulation, the court finds defendant guilty as charged in the indictment beyond a reasonable doubt.