488 So.2d 601 (1986)
Alan ZUKOR, Appellant,
v.
The STATE of Florida, Appellee.
No. 83-2469.
District Court of Appeal of Florida, Third District.
May 6, 1986.
Bennett H. Brummer, Public Defender, and Bruce A. Rosenthal, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen., and Jack B. Ludin, Asst. Atty. Gen., for appellee.
Before DANIEL S. PEARSON, FERGUSON and JORGENSON, JJ.
DANIEL S. PEARSON, Judge.
The defendant, Alan Zukor, was convicted of offenses involving cannabis and cocaine upon a plea of nolo contendere expressly reserving his right to appeal the trial court's dispositive denial of his motion to suppress the seized contraband. He contends here, as he did below, that the search of his carry-on suitcase which resulted in the discovery and seizure of the contraband was unlawful as being incident to an unlawful arrest or detention.
The events leading to the seizure of the contraband from the defendant's suitcase *602 are substantially undisputed. Two plainclothes narcotics detectives saw the defendant arrive in a taxicab at the Amtrak train station in Miami. Zukor, carrying a small suitcase, entered the station waiting room and, although his train was not scheduled to depart until forty to fifty minutes later, went directly to the boarding gate. Unable to board, he returned to the station and took a seat.
The detectives, observing that the defendant appeared very anxious, questioned Zukor's cab driver, who said that he had picked up the defendant at the Quality Inn on LeJeune Road. The detectives then approached the defendant, engaged him in conversation, and asked him for identification and his train ticket. The defendant had no identification but produced a train ticket issued to one David Leech. When asked how he spelled his last name, the defendant replied, "L-e-a-c-h." He further informed the detectives that he was a salesman from Boston and that he had stayed the past week at the Quality Inn near the airport.
At this point the detectives identified themselves as narcotics officers and, as is their usual procedure, expressed their concern about the problem of narcotics moving through the train station. At the mention of narcotics, the defendant began to perspire despite the fact that the waiting room was air conditioned. After a brief discussion concerning whether the defendant would consent to having a trained dog sniff his suitcase,[1] the detectives advised the defendant that they were going to have a dog sniff the suitcase, and the dog, Ringo, apparently near at hand, was brought forward to the suitcase at the defendant's seat. Although Ringo did not alert on the suitcase, it is undisputed that the detectives believed that the dog was simply not in the mood to work at that time and that his failure to alert did not dissipate their suspicions. The detectives, however, discontinued all contact with the defendant and left him alone sitting in the station while they continued their investigation.
Immediately thereafter, the detectives contacted the State Attorney's office for advice as to the propriety of proceeding. Being told that they should further investigate, they then called the Quality Inn (where the defendant had purportedly stayed the preceding week and from which he was picked up by the taxicab) and learned that the motel's records showed that no one by the name of David Leach (phonetic) had been registered there during the time in question. Armed with this new information, the detectives decided to seek out the defendant and his bag for a second dog sniff.
By this time, the defendant, having heard the boarding announcement for his train, was standing in the boarding line. The detectives removed him from the line and placed him in the train master's room some thirty to forty feet away. The defendant's bag was removed from him, taken to the baggage room, and placed in a lineup of ten bags for Ringo to re-sniff. Ringo alerted on the defendant's bag, the defendant was arrested, and a search of the bag pursuant to a warrant then obtained revealed the contraband. The arrest of the defendant was completed before the scheduled departure of the train; the defendant and his luggage were separated for about five minutes; the total elapsed time from the first encounter between the detectives and the defendant until the defendant's arrest was less than thirty minutes; and the total time of actual contact between the detectives and the defendant was no more than ten minutes.
Clearly, the facts of this case do not support a finding that Zukor was stopped within the meaning of the Fourth Amendment during the first encounter between Zukor and the officers. The contact took *603 place in a public area; the officers wore no uniforms and displayed no weapons; they approached Zukor rather than summoned him. They requested rather than demanded his identification and ticket, promptly returned his ticket, asked a few questions, and quickly carried out a usually effective and non-intrusive, but in this case abortive, investigatory technique. There is no clear indication that a reasonable person under these circumstances would have reason to believe that he was not free to end the conversation. See United States v. Mendenhall, 446 U.S. 544, 553-54, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 508-09 (1980).
The defendant further admits in his brief, because "the first dog-sniff procedure yielded nothing in the way of fruits or additional articulable facts supporting a founded suspicion, the case turns on the justifiability of the officers' [later] ... conduct in removing the defendant from the boarding line shortly before the train departure, placing him in a train master's room thirty to forty feet away and detaining him therein, while the suitcase thereby removed from him was subjected to a second dog-sniff in a separate location, the baggage room."
The State concedes that there was no probable cause to arrest the defendant when he was removed from the boarding line and his suitcase taken to the baggage area. It argues, however, that the removal of the defendant from the line to the train master's room for the several minutes needed for the second dog sniff of the bag was a Terry- type detention,[2] that is, one which, because limited, may be based on less than probable cause, that is, on reasonable suspicion of criminal activities supported by articulable facts. The State further argues, and we agree, that an articulable reasonable suspicion was shown.
The record shows that the detention of Zukor and his bag, see United States v. Place, 462 U.S. 696, 708-09, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110, 122 (1983) ("when the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detention of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause"), was limited as Terry requires. While the Supreme Court of the United States has declined on more than one occasion to place a brightline time limit on investigative detentions of persons or luggage,[3]United States v. Sharpe, 470 U.S. ___, ___, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985), it is clear that the detention should "last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983). An examination of the decided cases reveals that the actual time of the detention is less significant than other factors in determining whether the detention will be deemed reasonable or unreasonable.[4] Thus, a ninety-minute detention of the suspect's luggage was held unreasonable where, even though the agents knew in advance the scheduled time and place of the suspect's arrival and had ample time to bring the dog to the destination airport, they nevertheless took the bags from the destination airport to another in order to effect a dog sniff. United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110. A fifteen-minute detention of the suspect in a police room was held unreasonable *604 where the police detained him while they brought his luggage to him instead of using a narcotics dog to resolve their suspicions more quickly. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229. Yet, a twenty-minute detention of the driver of a pick-up truck on suspicion of transportation of marijuana was found reasonable where the time was used by police in pursuing a second, related vehicle necessary to the investigation and where the suspect's own actions contributed to the delay. United States v. Sharpe, 470 U.S. ___, 105 S.Ct. 1568, 84 L.Ed.2d 605.
As Sharpe tells us, a critical factor in determining reasonableness of the detention is whether the authorities "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."[5]Id. at ___, 105 S.Ct. at 1575, 84 L.Ed.2d at 616. See also United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110; Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229. In the present case, the elapsed time from the initial contact between Zukor and the officers and his arrest on probable cause supplied by the second dog sniff is no more than thirty minutes. If Zukor or his luggage had been detained continuously for that amount of time, the reasonableness vel non of the detention would turn on the action of the police under the particular circumstances of the case.[6] Here, when Ringo refused to perform, the officers' suspicions were neither confirmed nor dispelled, and, lacking probable cause to arrest Zukor, they broke contact with him. If instead the officers continued to detain Zukor thirty minutes while they expeditiously retrieved a second dog from another location or, even less intrusively, detained only his luggage while awaiting the dog, we would not be precluded from finding that "diligent efforts ... likely to confirm or dispel their suspicions quickly" were being made and that, under the particular facts presented, a detention prolonged beyond the few minutes usually required to effect a dog sniff was not unreasonable.[7] A fortiori, we should not be precluded from finding that where, as here, the officers took a far less intrusive approach and left Zukor alone while they continued their investigation after the initial encounter, the brief detention thereafter was reasonable.
Zukor contends, however, that because he was twice "stopped" by the officers, the *605 second "stop," merely because it succeeded the first, makes the detention less limited so as to require a higher level of articulable suspicion than would ordinarily satisfy Terry. We reject this contention.
Only three cases have specifically considered the implications of successive stops. In United States v. Morin, 665 F.2d 765 (5th Cir.1982), the defendant, suspected of carrying drugs, was stopped in two different airports. On the basis of information relayed by agents observing him at Miami International, Dallas police approached the defendant at Dallas/Fort Worth Airport. Because Morin's bag had been drenched with perfume, a narcotics dog showed some interest in it, but failed to attack it, causing the officers to release Morin to continue his journey. Shortly after his arrival at Austin Municipal Airport, authorities alerted by the Dallas police stopped Morin again. Four officers surrounded him, confiscated his ticket, frisked him, and took him to the airport police office, where they subjected him to a body search. In concluding that the second stop constituted an arrest, the court stated that
"[e]xcept in the context of border searches, successive stops of an individual based on the same information strongly indicate that an arrest has taken place. The coercion inherent in the successive stop situation must be acknowledged. Otherwise, an intrusion which can be much more severe than an actual arrest will be allowed to take place on the basis of much less justification."

Id. at 769.[8]
In United States v. Ilazi, 730 F.2d 1120 (8th Cir.1984), the Eighth Circuit court found ample reasonable suspicion to justify both a first and second stop at a Minneapolis airport of a defendant who, when he deplaned, was staggering, glassy-eyed, sniffing and inhaling deeply, and stomping both feet as if something were in his boots. Where there is not one stop, but two, the court observed,
"[b]oth must be limited in scope and duration. To end [the court's] inquiry [there], however, would allow law enforcement officials to circumvent these requirements by subjecting an individual to successive stops, each sufficiently limited in scope and duration to satisfy the conditions of an investigatory seizure, but collectively so intrusive as to be tantamount to an arrest."

Id. at 1125.
But their agreement with Morin on this point did not, the Ilazi court reasoned, "compel a finding that an arrest occurs in every case involving successive stops... . [It is simply one of the] factors to be considered in determining when an interrogation rises to the level of arrest." United States v. Ilazi, 730 F.2d at 1125-26. Examining the facts before it, the Ilazi court concluded that had the second stop been the first, "it would fall well within the bounds of an investigatory stop." Id. at 1126.
"Under these circumstances, we do not believe this stop exceeded permissible bounds merely because it was a second stop  even though, as a second stop, it was inherently more intrusive and coercive than the first. To so hold would preclude law enforcement officials from stopping a suspect a second time whenever the first stop did not provide probable cause, even though it tended to confirm their suspicions of illegal activity. We believe that to adopt a per se rule prohibiting successive investigatory stops would unduly hinder efforts to interdict illegal drug traffic."

Id. (emphasis in original).
The Ilazi court, then, appears to be echoing the approach of the Fourth District in this state. In State v. Amerson, 392 So.2d 311 (Fla. 4th DCA 1980), a policeman in training approached a suspect on the basis *606 of a B.O.L.O., questioned him briefly, and released him. Thirty seconds later, as the suspect was walking away, he was stopped again because the trainee's supervising officer felt that the trainee should have inquired into additional matters. In finding both stops lawful, the court stated:
"His first interrogation of appellee fell short of obtaining information which would be of any real value... . We therefore criticize the training technique but find that the ineptitude with which it was conducted, requiring two stops rather than one, does not constitute that invasion of appellee's constitutional rights required to invalidate the stop. There will be circumstances under which it will be reasonable to make more than one stop under the [stop and frisk] statute and in each instance the facts must be examined to determine whether multiple stops are valid. They are not and should not be absolutely prohibited by the language of the statute."

Id. at 313.
Thus, there is no rule of law that ipso facto converts second stops into arrests or requires that a second stop be based on any higher degree of suspicion or even any additional information. The total time of actual contact between the detectives and Zukor was no more than ten minutes. Because of the dog's failure to perform, the first encounter neither increased nor dispelled the officers' suspicions. In the interim, the officers, their suspicions undiminished, sought further information regarding the defendant. They learned that Zukor had not, as he had said, stayed at the Quality Inn. This information further confirmed their suspicions that Zukor's one small suitcase indicated an in-and-out drug trip to Miami rather than a week-long business trip of a person traveling light. The next stop of Zukor and his luggage was undertaken for the purpose of, and in fact resulted in, a speedy resolution of the officers' suspicions. The circumstances here, therefore, are unlike those in Place, where the ninety-minute detention of luggage alone was sufficient to constitute a Fourth Amendment violation, and unlike those in Morin, where the suspect's ticket and identification were confiscated and other indicia of an arrest were present. Nor did the brief detention of Zukor in the train master's room result directly in a search of his luggage as did the defendant's detention in Royer. The search of Zukor's bag and resultant discovery of the evidence resulted from a five-minute detention of his luggage, which itself resulted in probable cause supplied by the narcotics dog's alert in the baggage room.[9]
"A court ... should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objective of the police might have been accomplished... . The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."

United States v. Sharpe, 470 U.S. at ___, 105 S.Ct. at 1576, 84 L.Ed.2d at 616 (citations omitted).
*607 Of course, our 20-20 hindsight tells us that the officers had open to them the arguably less intrusive alternatives of either removing Zukor's bag from his possession and leaving him in the boarding line for the few minutes needed to effect the second sniff, or taking Zukor with his bag to the baggage room while the sniff was performed. Their failure to choose these other alternatives does not make the alternative chosen unreasonable or unlawful.
The judgment under review is affirmed in all respects.
NOTES
[1] The defendant clearly denied the detectives permission to search the bag. Ironically, the defendant testified that he consented to a dog sniff, while the detectives testified that he did not. The trial court never resolved the conflict between these uniquely unself-serving statements. Instead, the court determined the dog sniff was proper with or without the defendant's consent.
[2] See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] The Court has specifically rejected the twenty-minute maximum for a Terry stop recommended in ALI, Model Code of Pre-Arraignment Procedure, § 110.2(1) (1975). United States v. Place, 462 U.S. at 709 n. 10, 103 S.Ct. at 2646 n. 10, 77 L.Ed.2d at 122 n. 10.
[4] The Supreme Court has acknowledged the "difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest." United States v. Sharpe, 470 U.S. at ___, 105 S.Ct. at 1575, 84 L.Ed.2d at 615. "Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." Id. This is not to say, of course, that the time factor alone regardless of the circumstances cannot be sufficient to constitute an infringement of Fourth Amendment rights. See, e.g., United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110.
[5] To some, the introduction of a "diligent pursuit" factor in the constitutional balancing process represents a slippery slope taking the law ever further from the principles of Terry.

"As long as the police are acting diligently to complete their investigation, it is difficult to maintain that law enforcement goals would better be served by releasing an individual after a brief stop than by continuing to detain him for as long as necessary to discover whether probable cause can be established.
....
"Regardless how efficient it may be for law enforcement officials to engage in prolonged questioning to investigate a crime, or how reasonable in light of law enforcement objectives it may be to detain a suspect until various inquiries can be made and answered, a seizure that in duration, scope or means goes beyond the bounds of Terry cannot be reconciled with the Fourth Amendment in the absence of probable cause."
United States v. Sharpe, 470 U.S. at ___, 105 S.Ct. at 1578, 84 L.Ed.2d at 619 (Marshall, J., concurring in the judgment).
[6] The Supreme Court has recognized "the important need to allow authorities to graduate their responses to the demands of any particular situation." United States v. Place, 462 U.S. at 709 n. 10, 103 S.Ct. at 2646 n. 10, 77 L.Ed.2d at 122 n. 10. See also State v. McFarland, 4 Ohio App.3d 158, 159, 446 N.E.2d 1168, 1171 (1982) ("circumstances which justify a temporary detention for a few minutes may not suffice to justify detention for thirty to forty minutes, or rigorous detention for fifteen minutes without active investigative effort").
[7] In pointing to the dangers of a "diligence" analysis, see supra note 5, and adoption of a reasonableness standard for stops, Justice Marshall recognizes that

"officials in one community may act with due diligence in holding an individual at an airport for 35 minutes while waiting for the sole narcotics detection dog they possess, while officials who have several dogs readily available may be dilatory in prolonging an airport stop to even 10 minutes." United States v. Sharpe, 470 U.S. at ___, 105 S.Ct. at 1580, 84 L.Ed.2d at 621 (Marshall, J., concurring in the judgment).
[8] It is important to note that in Morin, the court saw as present many of the factors constituting an arrest under traditional federal tests. The court noted the subjective intent of the officers to hold the suspect, the subjective belief of the suspect that he was not free to leave, and the fact that the suspect had become the focus of an investigation. United States v. Morin, 665 F.2d at 769.
[9] An alternative theory for the admissibility of the evidence is suggested by United States v. Martell, 654 F.2d 1356 (9th Cir.1981), cert. denied, 463 U.S. 1213, 103 S.Ct. 3551, 77 L.Ed.2d 1397 (1983). In Martell, where the defendants and their luggage were detained for twenty minutes awaiting the arrival of a narcotics dog, the court focused on the seizure of the luggage and found that, since reasonable suspicion existed that the luggage itself contained contraband, detention of the defendants, even if unlawful by virtue of impermissible duration, would not taint the seizure and ultimate search on probable cause of the luggage. "Since the agents conducted no interrogation of the appellants during the unlawful [by virtue of duration] portion of their detention, the agents gained nothing that they had not already learned during the permissible portion of their detention." Id. at 1361. See also State v. Bell, 483 So.2d 66 (Fla. 3d DCA 1986) (police able to locate checked luggage for purposes of sniff from own observations independent of detention of defendant).