**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rolando Gonzalez MORIN,
Defendant-Appellant.**

**No. 81–1055.**

United States Court of Appeals,
Fifth Circuit.

Jan. 15, 1982.

Frank T. Ivy, Mark Cohen, Austin, Tex., for defendant-appellant.

LeRoy M. Jahn, Archie Carl Pierce, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before GEE, GARZA and REAVLEY, Circuit Judges.

GARZA, Circuit Judge:

Defendant was indicted for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). He sought exclusion of the cocaine, by means of a pre-trial motion to suppress. This motion was denied by the court below. Thereafter, defendant waived jury trial and was tried and convicted on stipulated facts. This appeal followed.

Suspicion first fell on defendant, Rolando Gonzalez Morin, at Miami International Airport when he purchased a one-way ticket to Dallas/Ft. Worth seven minutes prior to the noon departure time. The Braniff ticket agent with whom Morin dealt contacted a Miami police officer, Thomas Dazevedo, because of various suspicious circumstances which he noted. Specifically, the defendant exhibited a very nervous demeanor, purchased his ticket very close to the flight departure time, and paid for it with cash. These characteristics are elements of a composite drug courier profile which is utilized by narcotic agents in identifying drug carriers.[1] Consequently, the officer initiated an investigation based on the ticket agent's observations. He discovered that Morin had made reservations for the Miami-Dallas flight at 10 p.m. the previous evening and had left a call-back number at the Marriott Hotel. Dazevedo then

---

1. The characteristics which make up the drug courier profile were listed in *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979):

The seven primary characteristics are: (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcases; (3) unusual itinerary, such as rapid turn-around time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amounts of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination currency; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.

The secondary characteristics are (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious call-back number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities. *Id.* at 1039, n.3.

spoke with the desk clerk at the Marriott and learned that defendant had checked in the hotel, paid with a one hundred dollar bill and left without retrieving his twenty-four dollars change. This additional information served to confirm the officer's suspicion about Morin, since these factors also figure in the drug courier profile.

In an effort to confirm his suspicions, Dazevedo had Morin's name entered into the Narcotics and Dangerous Drugs Information System (NADDIS) computer. The computer search indicated that defendant had previous narcotics convictions and was suspected of smuggling drugs from Colombia. At this point, the officer phoned law enforcement authorities in Dallas and alerted them to his investigation. He then proceeded to the Marriott Hotel and examined the room which defendant had occupied the previous evening. He found a traffic ticket made out to Rudy Moreno and an airline ticket for an Austin-Miami flight in the name of R. Carlos. This indication of probable use of an alias was further confirmation of Dazevedo's suspicions. Next, he once again telephoned Dallas law enforcement authorities, including Sergeant Gary Vineyard of the Texas Department of Public Safety, and revealed his findings, as well as his deduction that defendant was a drug courier on his way to Austin.[2]

When defendant deplaned at the Dallas/Ft. Worth airport, he was immediately placed under surveillance by law enforcement authorities. Eventually, he proceeded with his luggage to a ticket counter in order to purchase a ticket to Austin. At this time, Sgt. Gary Vineyard approached Morin, identified himself as a police officer on the narcotics detail, and asked to speak with him. After defendant finished his transaction, he spoke with Vineyard. In response to the officer's questioning about his itinerary, Morin stated that he had been in Miami visiting friends for a couple of days.[3] He responded negatively to the officer's inquiry about whether he was carrying narcotics. Morin did agree to a search of his carry-on bag but would not consent to a search of his checked bag. A drug detection dog was called in to sniff this bag. The dog did show some interest in the bag, but since he did not attack it, there was no clear indication that drugs were inside.[4] Having failed to establish the probable cause necessary to take defendant into custody, Vineyard allowed Morin to board the plane to Austin. Morin was the last passenger to board the plane. Vineyard did alert Austin law enforcement authorities to defendant's imminent arrival and description, however, as well as his suspected criminal activity. This information was related to narcotics officer James Wolsch. He and Officer Robert Nesteroff went to Austin Municipal Airport to meet defendant's flight.

In Austin, Morin was the last passenger to deplane from his flight. According to Officer Wolsch's testimony, defendant appeared very nervous and was sweating profusely. He passed through the security area of the airport and went immediately to the restroom. Officer Wolsch first approached Morin at this point. As defendant stood before a urinal in the otherwise empty restroom, Wolsch stepped up to his right side, identified himself as a police officer and stated that he suspected defendant of carrying narcotics. He asked for identification, which Morin supplied and Wolsch kept. Defendant's airline ticket was also taken at this time. Wolsch was accompanied by three other plain-clothes policemen, one of whom was standing on the other side of defendant and two others who were approximately ten to fifteen feet away. Wolsch told defendant that the officers wished to question him and asked him to accompany them to the airport police office. Officer Wolsch next inquired twice whether Morin had any luggage other than the carry-on bag which was next to him. He

2. Morin had listed an Austin, Texas home address on the hotel registration form.

3. This response was contradicted by the Marriott hotel records.

4. Sgt. Vineyard testified that the bag smelled like it had been drenched with perfume.

made this inquiry despite the fact that he knew the answer based on information from the Dallas law enforcement authorities. Defendant denied having any other luggage.[5] He was then briefly frisked and taken to the airport police office, where he was subjected to a body search.

Officer Wolsch went immediately to the baggage claim area and claimed the only remaining piece of luggage.[6] He opened the bag and found three bags of cocaine in two boots. Wolsch returned to the police office with the bag. Defendant was formally arrested and apprised of his constitutional rights. Morin, by means of a pretrial motion, sought to suppress the evidence seized by the Austin police officers. The motion was denied by the court below after a full evidentiary hearing. Defendant was thereafter convicted in a non-jury trial of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). This appeal followed.

Morin challenges the trial court's denial of his motion to suppress on a number of grounds. Basically, he contests the lower court's finding that he abandoned the luggage. He asserts that his verbal disclaimer of the luggage was tainted by an illegal arrest. The evidence found must be suppressed as "fruit of the poisonous tree". *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

This case is very different from the many airport stop cases with which this Court has been presented. Although certainly cognizant of the rule that "not all personal intercourse between policemen and citizens involves 'seizures' of persons", *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1879 n.16, 20 L.Ed.2d 889 (1968), today we are forced to acknowledge the coercion inherent in successive stops of a suspect based on the same grounds for suspicion.[7] This Court has recognized three different levels of police-citizen contact.[8] As the Supreme Court stated in *Terry*, a police officer, like any other citizen, has the right to approach an individual and ask him questions. The citizen has a corresponding right to walk away. In order to stop one who does not voluntarily submit to questioning, an officer must possess specific articulable facts which provide the basis for a reasonable suspicion of criminal activity. The third level of police-citizen contact is the arrest which must be supported by probable cause.

The distinctive element in this case is the fact defendant was stopped twice in two different airports. It is clear that Dallas law enforcement authorities possessed the requisite information to justify an investigatory stop. Officer Dazevedo of Miami had related the results of his investigation to Dallas; this knowledge provided the basis for the stop.[9] Unfortunate-

5. The government claims that defendant made five acts of oral abandonment. The third act of abandonment occurred just outside the restroom area and was in response to another question by Wolsch. Defendant spontaneously denied having any other luggage when Wolsch walked into the police office with the bag. The fifth act of abandonment came after Morin was officially under arrest and was being interviewed at the police station in downtown Austin.

6. There was no claim receipt to connect Morin with the luggage. Defendant testified he swallowed it on the way to the airport security office. However, the link between Morin and the bag was supplied by the Miami hotel receipt found in the luggage.

7. Border searches are specifically excluded from our discussion.

8. The Supreme Court has not settled the issue of when police-citizen contact is a "seizure" within the meaning of the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). We therefore rely on the law of this circuit as stated in *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979).

For an illustrative statement about the issue of when a seizure occurs and the proof necessary for its justification, see *United States v. Herbst*, 641 F.2d 1161, 1167 n.8 (5th Cir. 1981).

9. An investigatory stop is lawful if it is based on a reasonable suspicion that the person is involved in criminal activity. This reasonable suspicion must stem from specific articulable facts. Manifestation of a few of the drug courier profile characteristics, without more, does not support a finding of reasonable suspicion. *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). However, as this Court

ly, the drug detection dog failed to provide them with probable cause to hold the defendant. Morin was allowed to proceed to his destination. When he arrived in Austin, however, he was stopped once again.

The details of this second stop are crucial to a determination of this case. Appellant Morin was literally caught with his pants down in an otherwise empty public bathroom. Four officers were involved in the stop; one on either side of defendant and two more ten to fifteen feet away. One of the officers, Officer Wolsch, told defendant that he was suspected of carrying narcotics and asked him to produce identification, which he did. Morin's airline ticket was also confiscated at this time. Officer Wolsch then informed defendant that the officers wished to question him at the airport security office. Finally, he inquired whether defendant had any other luggage.

█ The government contends that this police-citizen contact did not even rise to the level of a seizure. They stress that no weapons were displayed, the suspect was not touched, and a calm attitude was displayed by police when they interrogated defendant. Moreover, they assert that defendant was not intimidated by the questioning. The government notes that this Court has consistently found no seizure when agents employing a drug courier profile request an airline passenger to produce his ticket and identification, as long as the passenger's conduct is voluntary and not the result of coercion. *U. S. v. Berd*, 634 F.2d 979 (5th Cir. 1981); *U. S. v. Pulvano*, 629 F.2d 1151 (5th Cir. 1980); *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980). The above mentioned

cases do not address the situation faced here, however, where a second stop of a suspect is made on the basis of the same information that justified the primary stop. Defendant argues that in light of the location of this stop, the number of officers involved, as well as the fact that he had been subjected to a prior stop, this stop must be characterized as an arrest.

This Court utilizes a four factor test to determine when an interrogation rises to the level of an arrest requiring probable cause. These factors are: "(1) whether probable cause to arrest has arisen, (2) whether the subjective intent of the officer conducting the interrogation was to hold the defendant, (3) whether the subjective belief of the defendant was that his freedom was significantly restricted, and (4) whether the investigation had focused on the defendant at the time of the interrogation." *United States v. Warren*, 578 F.2d 1058, 1071 (5th Cir. 1978). We now hold that an addition to this list must be made. Except in the context of border searches, successive stops of an individual based on the same information strongly indicate a finding that an arrest has taken place. The coercion inherent in the successive stop situation must be acknowledged. Otherwise, an intrusion which can be much more severe than an actual arrest will be allowed to take place on the basis of much less justification. Certainly, this result was not intended by the Supreme Court when it approved the limited *Terry* stop.

█ The case for characterization of this stop as an arrest is further strengthened when the traditional four factor arrest test is applied to the facts presented here. The first factor need not concern us for the

very recently noted in *United States v. Sanford*, "[i]nclusion of some of those characteristics within the 'informally compiled' drug courier profile does not mean that they cannot be considered significant when properly evaluated. Such a rule would be wholly inconsistent with our holdings in [*United States v.*] Berd [634 F.2d 979 (5 Cir. 1981)] and [*United States v.*] Robinson [625 F.2d 1211 (5 Cir. 1980)]." 658 F.2d 342 at 346 (5th Cir. 1981). In this case, the Miami investigation had revealed the following specific articulable facts which were

known to Dallas authorities: (1) Morin had used an alias; (2) he was traveling from a known drug center; (3) he paid his hotel bill with cash and failed to retrieve $24.00 in change; (4) he purchased his airline ticket very close to departure time and paid for it with cash; (5) he had prior narcotics arrests and was suspected of drug smuggling; (6) he made a statement about his visit to Miami that was contradicted by hotel records; (7) he purchased two separate tickets for the flight to his final destination.

government has never contended that probable cause was present before the cocaine was found. With regard to the subjective intent of the officers to hold defendant, we express grave doubts about the willingness of the officers to allow Morin to walk away. The number of officers involved, as well as the location and the fact that the stop was made before any new information had been learned, testify to the intention of the officers. Likewise, it cannot be seriously contended that defendant thought he was free to terminate this questioning. He was never told he was free to leave. The government placed much emphasis on the fact that defendant was sweating profusely and looking about very nervously when he deplaned in Austin in order to further justify their stop. The government also stated that in the restroom Morin was sweating profusely, his shirt was wringing wet, his voice was quivering, and he was very tense. In light of these factors and the Dallas stop, defendant surely knew he was not free to go. The final factor of this test presents no difficulty for our analysis since the officer clearly focused his investigation on defendant. All of the circumstances surrounding this interrogation confirm its custodial character. Absence of the probable cause necessary to effect a valid arrest renders this arrest illegal.[10]

10. This case can be compared to *United States v. Hill*, 626 F.2d 429 (5th Cir. 1980). In that case, a narcotics agent stopped the defendant and briefly questioned him. He then sought defendant's permission to search his luggage. Defendant responded, "not without a search warrant." The agent told defendant he had nothing to fear if he was not carrying drugs. The defendant again responded that he would not allow a search without a warrant. At this point, the agent requested defendant accompany him to an airline office. This Court made the following observations about the agent's actions:

In our view, when Markonni requested Hill to come with him to the Delta office, the interrogation could no longer be characterized as "brief" or "on-the-spot." Rather, the request signaled the beginning of a more extended interrogation which was to occur in a place other than where it began. Second, as in *Dunaway [v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)] Hill was

We must now consider whether the defendant's alleged abandonment of his luggage removed the taint of the illegal arrest. Abandonment, like consent, must be freely given in order to be effective. As this Court held in *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973):

"The issue is not abandonment in the strict property sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search."

*Id.* at 176.

In the instant case, there is a clear nexus between the illegal arrest of Morin and the subsequent verbal disclaimer of his luggage. Undoubtedly, Morin perceived no other option, at the time of Officer Wolsch's question, than a denial of possession of other luggage. This was not a truly voluntary relinquishment of property interest but merely the product of police misconduct. *See United States v. Beck*, 602 F.2d 726, 729–30 (5th Cir. 1979). The district court's finding that Morin voluntarily abandoned his luggage is clearly erroneous. The facts of this case present a more aggravated situation than that condemned by this Court in *United States v. McCain*, 556 F.2d 253 (5th

never informed that he was "free to go," and the circumstances surrounding the request indicate that Hill would have been physically restrained if he had refused to accompany Markonni or had tried to escape his custody. Third, as in *Dunaway*, the circumstances indicate that the detention involved here was for the purpose of interrogation. In sum, the scope of the intrusion involved in Markonni's request for Hill to accompany him to the Delta office was significantly greater than that involved in a brief *Terry* stop, and therefore amounted to an arrest.

*Id.* at 435–36.

(footnotes omitted)

The district court found that in the instant case, unlike *Hill*, defendant consented to accompany officers to the airport security office. We hold that in light of the past stop and in view of the circumstances surrounding this stop, effective voluntary consent was not given by Morin. The district court's finding is clearly erroneous.

Cir. 1977). *McCain* involved the border search of a defendant suspected of carrying drugs. She was clearly "in custody" for *Miranda* purposes during the strip search. The government contended that she was not in custody after this when, as she waited for her luggage to be reexamined, an inspector warned her of the serious dangers of carrying contraband in her body. The Court found that the inspector " 'deliberately' and 'designedly' set out to elicit from Ms. McCain her admission that she had narcotics in her body." *Id.* at 256. The Court condemned the failure of the inspector to give *Miranda* rights before making such a statement. In the case before the Court today, we are presented with another case where *Miranda* rights were not given. Subsequently, defendant was questioned about luggage about which the police officer knew. The police officer was deliberately seeking an admission that Morin had other luggage containing drugs. When Morin denied having other luggage, the officer searched the bag and then the government proceeded on the theory that the luggage was abandoned.

The Supreme Court, in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), made the following clarification of "incriminating response" which is relevant here: "By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* 446 U.S. at 301 n.5, 100 S.Ct. at 1686 n.5, 64 L.Ed.2d at 308 n.5. The prosecution introduced defendant's disclaimer statement at the trial. It clearly incriminated him because it allowed the search of his luggage. Since defendant was not informed of his *Miranda* rights prior to the moment he disclaimed the luggage, the statement of abandonment which he made in response to interrogation should not have been admitted. The evidence should have been suppressed, and, therefore, this case must be reversed and remanded.

REVERSED AND REMANDED.