**UNITED STATES of America, Appellant,**

**v.**

**Abdula ILAZI, Appellee.**

**No. 83–1991.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1983.

Decided March 26, 1984.

Douglas W. Thomson and Robert J. Sorensen, Thomson & Hawkins, St. Paul, Minn., for appellant.

James M. Rosenbaum, U.S. Atty., Joseph T. Walbran, Asst. U.S. Atty., D. Minn., Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, BRIGHT, Circuit Judge and HANSON *, Senior District Judge.

BRIGHT, Circuit Judge.

Abdula Ilazi, charged with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) [1], moved to suppress the introduction of 223 grams of cocaine on the ground that it had been obtained from him in violation of his fourth amendment rights. The district court [2] denied the motion, 563 F.Supp. 730, and convicted Ilazi following a trial on stipulated facts. Ilazi appeals, contending that the district court erred in denying his motion to suppress. We affirm.

On appeal, Ilazi argues that government agents initially stopped and detained him without a reasonable and articulable suspicion that he was engaged in criminal activity. He also contends that by stopping him a second time, government agents exceeded the bounds of an investigatory stop, rendering their second encounter with him an arrest without probable cause. Finally, Ilazi argues that a government agent attempted to search him without his consent and without a warrant under circumstances that did not justify a warrantless search. In each instance, according to Ilazi, the agents' actions tainted the evidence subsequently seized, requiring its suppression.

### I.  *Background.*

On January 31, 1983, Abdula Ilazi and Islam Pinjoli arrived at the Minneapolis-St. Paul International Airport on a flight from West Palm Beach, Florida. Minnesota Bureau of Criminal Apprehension (BCA) Special Agent Thomas Olby and Airport Police Department Officer Marilyn Mortensen, who were conducting routine surveillance to intercept drug traffickers, watched as the passengers deplaned. Neither Ilazi nor Pinjoli, among the last passengers to leave the plane, carried any luggage. With glassy eyes, Ilazi and Pinjoli slowly walked off the plane, staggering from left to right, sniffing and inhaling deeply after placing their fingers next to their noses.

---

* The Honorable WILLIAM C. HANSON, United States Senior District Judge for the Northern and Southern Districts of Iowa.

1. 21 U.S.C. § 841(a)(1) provides:
    (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

2. The Honorable Edward J. Devitt, United States Senior District Judge for the District of Minnesota.

As Ilazi and Pinjoli left the gate area, they stared directly at Agent Olby and Officer Mortensen. The two men checked a nearby flight monitor and then, after glancing over their shoulders at the agents, they started down the concourse. Ilazi walked with some difficulty, continually stomping both his feet. Again glancing over their shoulders at the agents, Ilazi and Pinjoli entered a men's restroom. Officer Olby joined them in the restroom and, although he was very close to Pinjoli, smelled no alcohol. Officer Mortensen seized this opportunity to contact Drug Enforcement Administration Special Agents James Lewis and Jerry Kramer, who were also on airport duty, and advise them of the situation.

After leaving the restroom, Ilazi and Pinjoli proceeded down the concourse to the (Charles A.) Lindberg Bar. Before entering the bar, the men again stared directly at the agents. Ilazi and Pinjoli entered the bar and sat down. Ilazi, seated at the table, continued to stomp his left boot.

### A.  *First Encounter with Pinjoli.*

When Pinjoli left the bar, approximately five minutes later, Agent Olby and Officer Mortensen approached him. They identified themselves as police officers, displayed their badges, and asked to speak to him, explaining that he was not under arrest and was free to go. Agent Olby asked to see Pinjoli's ticket. The ticket, issued in the name of Sam Antone and purchased with cash, authorized a round trip from Anchorage, Alaska to West Palm Beach, Florida, departing Anchorage on January 30, 1983 with an open return. Agent Olby also learned that Pinjoli was an alien from Yugoslavia, without identification, passport, or immigration papers. Pinjoli explained that he had lost his papers in a swimming pool in Florida, but that Ilazi, who was from Yugoslavia also, had an immigration registration card. When asked, Pinjoli refused to tell the agents how long he had been in Florida.

Agent Olby asked Pinjoli to return to the bar and get Ilazi so that Olby could speak to him. Agent Olby and Officer Mortensen accompanied Pinjoli to the bar, but, at Pinjoli's request, waited outside while he went in to get Ilazi. As he entered the bar, Pinjoli glanced over his shoulder to see if the agents were watching him, and then grabbed his right ankle and patted it while looking at Ilazi. Ilazi, acknowledging Pinjoli's signal, leaned over in his chair and did something to his lower leg or foot.

### B.  *First Encounter with Ilazi.*

When Pinjoli and Ilazi approached the agents, Agent Olby informed Ilazi that he was not under arrest but was free to go, and asked Ilazi for identification. Ilazi produced an Immigration and Naturalization Service (INS) form, indicating that he must leave the United States at his own expense on or before February 18, 1983. Agent Olby asked to see Ilazi's airline ticket. The ticket, issued under the name of John Ilazi and purchased with cash, authorized a round trip from Anchorage, Alaska to West Palm Beach, Florida, departing Anchorage on January 30, 1983 with an open return. Agent Olby asked Ilazi whether he had a driver's license. With trembling hands, Ilazi produced a driver's license, issued under the name of Abdula Ilazi. When asked, Ilazi denied carrying either narcotics or large amounts of U.S. currency, and informed Agent Olby that neither he nor Pinjoli had any luggage. Pinjoli explained that he had forgotten his luggage in Florida and that a friend would be returning it to Anchorage. The agents thanked Pinjoli and Ilazi for their cooperation and left. Following this discussion, Agent Olby and Officer Mortensen met with Agents Lewis and Kramer and explained to Lewis and Kramer the details of their conversation with Ilazi and Pinjoli.

### C.  *Second Encounter with Ilazi.*

Agents Lewis and Kramer went back past the Lindberg Bar and noticed that Ilazi and Pinjoli were preparing to leave the bar. The agents watched as the two men left the bar and proceeded down the concourse. Lewis and Kramer noticed that

Ilazi walked like "a two-year-old child with a dirty diaper." At that point, Agents Lewis and Kramer approached Ilazi and Pinjoli, displayed their badges, identified themselves as federal agents, and asked to see the men's travel papers. Ilazi handed his airline ticket, INS form, and driver's license to Lewis. Pinjoli explained that his billfold and immigration papers had been stolen in Florida, and that he did not have an airline ticket because he was traveling with Ilazi. Pinjoli subsequently handed his ticket to Agent Kramer.

In addition to the information on these documents previously discovered by Agent Olby and Officer Mortensen, Lewis and Kramer noticed that Ilazi's driver's license indicated that he was born in Alaska and that the airline tickets had sequential numbers of issue. Agent Lewis asked if either man had any immigration documents. Both replied that they did not, although they admitted that they were Yugoslavian citizens. Neither man responded when Agent Lewis asked whether they knew they were required to carry these documents at all times. Agent Lewis returned the documents to Ilazi and asked if they had any luggage. Pinjoli replied that a friend was bringing it from Florida tomorrow.

At this point, the agents noticed a bulge on the inside of Ilazi's right boot. Agent Lewis asked the men what they had in their boots. Pinjoli pulled up his pant legs to display the tops of his boots and replied that he had nothing in his boots; Ilazi said nothing. Agent Lewis bent over to look at Ilazi's ankles. He noticed that Ilazi's right boot was unzipped and that there was a bulge in his sock. Agent Lewis reached toward this bulge. Ilazi jumped back as Agent Lewis touched his boot and Agent Lewis said, "Let's go." The agents took Ilazi and Pinjoli to the BCA's airport office, where they were told they were under arrest. Subsequent searches revealed two bags of cocaine hidden in Ilazi's boots and another bag of cocaine concealed in his underwear.

## II. Discussion.

### A. The First Seizure.

■ Supreme Court decisions identify, at least theoretically, three categories of police-citizen encounters: voluntary communication between law enforcement officers and citizens; brief, minimally intrusive, investigative stops; and highly intrusive, full-scale arrests. *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir.1983). Investigative stops and arrests are "seizures" within the meaning of the fourth amendment, and thus require some particularized and objective justification; voluntary communication does not. *Id.* An investigative stop by a law enforcement officer must be supported by a reasonable and articulable suspicion of criminal activity. *Id.* The district court concluded that Ilazi's initial stop by Agent Olby and Officer Mortensen was so supported. We agree.

■ To be reasonable, the suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). It must be based on specific and articulable facts, and the rational inferences to be drawn therefrom by those "trained and experienced in discerning in ostensibly innocuous behavior the indicia of narcotics trafficking." *United States v. Forero-Rincon*, 626 F.2d 218, 221–22 (2d Cir.1980). *See also United States v. Wallraff, supra*, 705 F.2d at 988.

Several recent Supreme Court decisions guide us in our application of these principles. In *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a majority of the Court agreed that two agents at the Miami International Airport had reasonable, articulable suspicion to justify a temporary detention when a casually dressed, nervous young man, carrying heavy American Tourister luggage and traveling under an assumed name, purchased a one-way ticket to New York City with cash, and wrote only a last name and his destination on the baggage identification tags, which called for name, address, and telephone number. The justices disa-

greed in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), whether the agents' observations provided the requisite suspicion to justify an investigatory stop. In that case, Mendenhall arrived at the Detroit Metropolitan Airport on an American Airlines flight from Los Angeles, a drug-source city. She was the last person to leave the plane and appeared very nervous, scanning the entire gate area as she deplaned. After leaving the plane, she walked past the baggage area without claiming any luggage and proceeded to an Eastern Airlines ticket counter where she picked up a boarding pass for her flight out of Detroit. Three justices found that the agents "reasonably associated" Mendenhall's conduct with criminal activity, noting that drug couriers often deplane last to detect more easily the presence of government agents in the gate area, and frequently travel without baggage and change flights en route to avoid surveillance. *Id.* 446 U.S. at 564–65, 100 S.Ct. at 1882. Four justices, on the other hand, did not find Mendenhall's conduct unusual, "but rather the kind of behavior that could reasonably be expected of anyone changing planes in an airport terminal," her failure to claim luggage attributable to the fact that she was already ticketed on a flight out of Detroit on another airline and that fact confirmed by her receiving only a boarding pass at the Eastern Airlines ticket counter. *Id.* 446 U.S. at 572–73, 100 S.Ct. at 1886.

In *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), a majority of the Court concluded that the agent could not, as a matter of law, have reasonably suspected Reid on the basis of what he observed. In that case, the agent knew that Reid arrived from Fort Lauderdale, a drug-source city, in the early morning when law enforcement activity was diminished. Reid and his companion apparently had no luggage other than the shoulder bags they carried, and they appeared to the agent to be trying to conceal the fact that they were traveling together. In rejecting these observations as sufficient to justify a

reasonable suspicion, the majority noted that

> only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to *their particular conduct.* The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure. *Id.* (emphasis added).

The agent's belief that the petitioner and his companion were attempting to conceal the fact that they were traveling together, the majority observed, was more an unparticularized hunch than a fair inference in the light of the agent's experience. *Id.*

■ Although the question in the present case is a close one, we agree with the district court that Agent Olby and Officer Mortensen reasonably suspected Ilazi of criminal activity. Unlike the situation in *Reid* and more akin to that in *Royer,* most of the facts giving rise to the agents' suspicions in this case were based on Ilazi's own conduct, rather than on circumstances describing "a very large category of presumably innocent travelers." As Ilazi deplaned, he aroused the suspicions of Agent Olby and Officer Mortensen, not simply because he carried no luggage and was among the last passengers to get off a plane that had just arrived from a drug-source city, but because he looked and acted stoned, and engaged in conduct that Agent Olby recognized as characteristic of cocaine users. Upon further observation, the agents noticed that Ilazi continually stomped both feet as if to pack down something concealed in his boots. On several occasions, as Ilazi proceeded down the concourse, he glanced over his shoulder at the agents as if fearful of detection. Finally, when Pinjoli returned to the bar to get Ilazi at Agent Olby's request, the agents saw Pinjoli signal Ilazi and saw Ilazi respond to that signal. These observations, made by agents familiar with the behavior and practices of narcotics couriers, together with

the rational inferences to be drawn from them, provided the agents with the reasonable suspicion necessary to justify an investigatory stop.

Defense counsel discusses each of the agents' observations and correctly points out that a number of them are subject to innocent explanations. In determining whether the requisite degree of suspicion existed, however, we must view the agents' observations as a whole, not as discrete and disconnected occurrences. *United States v. Wallraff, supra,* 705 F.2d at 988. In addition, as one court noted, "It must be rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation." *United States v. Price,* 599 F.2d 494, 502 (2d Cir.1979). For that reason, conduct as consistent with innocence as with guilt may still indicate possible illicit activity and form the foundation for a valid investigatory stop. *United States v. Wallraff, supra.*

B. *The Second Seizure.*

The district court concluded that reasonable suspicion also justified the stop by Agents Lewis and Kramer. Ilazi does not contest this finding, but argues instead that the second stop, occurring as it did soon after the initial stop by Olby and Mortensen, exceeded the bounds of an investigatory stop and, therefore, constituted an arrest without probable cause. We disagree.

An investigatory stop, allowable on the mere suspicion of criminal activity, must be limited in scope and duration. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983); *United States v. Miller,* 546 F.2d 251, 253 (8th Cir.1976). The importance of these requirements cannot be overstated for it is the limited and transitory nature of the stop that justifies the elimination of the probable cause requirement typically accompanying fourth amendment seizures.

Here we have not one stop, but two. Both must be limited in scope and duration. To end our inquiry here, however, would allow law enforcement officials to circumvent these requirements by subjecting an individual to successive stops, each sufficiently limited in scope and duration to satisfy the conditions of an investigatory seizure, but collectively so intrusive as to be tantamount to an arrest.

The Fifth Circuit considered the problem of successive stops in *United States v. Morin,* 665 F.2d 765 (5th Cir.1982). There, a police officer first stopped and questioned Morin, a suspected narcotics courier, in the Dallas/Fort Worth International Airport. Having failed to establish probable cause, the officer allowed Morin to board a plane to Austin, but alerted Austin law enforcement officials to his arrival. In Austin, Morin deplaned and, after passing through airport security, went to a public restroom. As Morin stood before a urinal in the otherwise empty restroom, four law enforcement officers entered the restroom and positioned themselves one on either side of Morin and two more ten to fifteen feet away. They identified themselves as police officers, and declared that they suspected Morin of carrying narcotics. After confiscating Morin's identification and his airline ticket, the officers asked him to accompany them to the airport police office for questioning. In concluding that Morin's second encounter with law enforcement officials constituted an arrest, the court acknowledged the "coercion inherent in the successive stop situation" and stated that "successive stops of an individual based on the same information strongly indicate a finding that an arrest has taken place." *Id.* at 769.

We agree with the Fifth Circuit's observations, but that agreement does not compel a finding that an arrest occurs in every case involving successive stops. The Fifth Circuit itself did not so hold. The court

simply added the presence of successive stops to its list of factors to be considered in determining when an interrogation rises to the level of arrest.[3] The Fifth Circuit conceded that even the application of its traditional test supports the characterization of the second encounter as an arrest, *id.* at 769, emphasizing that *"all of the circumstances* surrounding this interrogation confirm its custodial character." *Id.* at 770 (emphasis added).

■ Turning to the facts before us, we cannot say the same. On the contrary, had this stop been the first, it would fall well within the bounds of an investigatory stop. Agents Lewis and Kramer approached Ilazi and Pinjoli in a public place. They did not draw their weapons nor in any way block Ilazi's progress. The agents simply asked to speak to the two men and, upon that request, Ilazi and Pinjoli stopped walking and turned to face the agents. The agents did, of course, identify themselves as federal officers and display their badges, but this alone is not a show of authority sufficient to transform an investigatory stop into an arrest. Unlike the officers in *Morin*, Agents Lewis and Kramer did not ask that Ilazi accompany them to an office or a room elsewhere in the airport. Agent Lewis did not demand to see their airline tickets and identification, but rather asked, "Do you mind if we take a look at your travel papers?" After examining the documents, Agent Lewis did not keep them, but immediately returned them to Ilazi.

Under these circumstances, we do not believe this stop exceeded permissible bounds *merely* because it was a second stop—even though, as a second stop, it was inherently more intrusive and coercive than the first. To so hold would preclude law enforcement officials from stopping a suspect a second time whenever the first stop did not provide probable cause, even though it tended to confirm their suspicions of illegal activity. We believe that to adopt a per se rule prohibiting successive investigatory stops would unduly hinder efforts to interdict illegal drug traffic. Because of the inherently transient nature of drug courier activity, immediate, on-the-spot investigations, which frequently involve talking directly to the individuals suspected of such activity, substantially enhance the likelihood that law enforcement officers will be able to prevent the flow of illegal narcotics into distribution channels.

## C. *The Attempted Search.*

Finally, Ilazi contends that during the second investigatory stop, Agent Lewis illegally attempted to search his boot.[4] Specifically, Ilazi argues that when Lewis reached for his boot, he lacked the reasonable fear for his own safety or that of others required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to justify a protective frisk. We need not address this particular argument because we uphold the attempt to search Ilazi's boot as incident to his lawful arrest.

■ A search is valid as incident to an arrest even if it is conducted before the actual arrest, provided that (1) the arrest and the search are substantially contemporaneous, and (2) probable cause to arrest existed before the search. *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980); *United States v. Costello*, 604 F.2d 589, 590–91 (8th Cir.

---

**3.** That list includes "(1) whether probable cause to arrest has arisen, (2) whether the subjective intent of the officer conducting the interrogation was to hold the defendant, (3) whether the subjective belief of the defendant was that his freedom was significantly restricted, and (4) whether the investigation had focused on the defendant at the time of the interrogation." *United States v. Warren*, 578 F.2d 1058, 1071 (5th Cir.1978) (en banc), *on rehearing aff'd in*

part and rev'd in part on other grounds, 612 F.2d 887 (5th Cir.) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

**4.** We assume, without deciding, that if this attempt to search was illegal, its illegality would taint the cocaine seized in a subsequent search, the legality of which is not contested.

1979). Here, the arrest "followed quickly on the heels of the challenged search." *Rawlings v. Kentucky, supra.* Agent Lewis arrested Ilazi as soon as he jumped back to prevent Lewis from consummating the search. The only question, therefore, is whether probable cause to arrest existed before the attempted search.

Probable cause to make a warrantless arrest depends upon

"whether, at the moment the arrest was made, * * * the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense."

*United States v. Matthews,* 603 F.2d 48, 51 (8th Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 650 (1980), quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The cumulative effect of all the facts and circumstances at the time of the arrest determines probable cause. *United States v. Matthews, supra,* 603 F.2d at 51.

█ Based on the cumulative effect of all the evidence in the record, we conclude that probable cause to arrest Ilazi existed when he refused to explain the bulge on the inside of his boot. Everything the agents learned, from the time Ilazi first aroused their suspicions with behavior characteristic of a cocaine user, confirmed those suspicions—his odd gait as if concealing something in his boots and in his pants, his quick round trip between Anchorage and West Palm Beach, his nervousness, and his response to Pinjoli's furtive signal. Against this backdrop, the agents noticed an unusual bulge on the inside of Ilazi's boot. When asked, Ilazi refused to explain this bulge. At this point, we think the information sufficient "to warrant a prudent man in believing that [Ilazi] * * * was committing an offense." *United States v. Matthews, supra. See United States v.*

*Elsoffer,* 671 F.2d 1294, 1299 (11th Cir. 1982) (where the unusual size and shape of a bulge and its abnormal position alone provided probable cause). By the time Agent Lewis reached for Ilazi's boot, the agents had probable cause to arrest and, therefore, the attempt to search was justified as a search incident to a lawful arrest.

In concluding as we do, we are ever mindful that a search incident to an arrest may not precede the arrest and yet serve as part of its justification. *See Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1967). Ilazi's response to the attempt by Agent Lewis to search his boot is in no way relevant to our inquiry into probable cause.

III. *Conclusion.*

Having found no error in the district court's refusal to suppress the challenged evidence, we affirm its judgment.