**UNITED STATES of America**

v.

**Richard Nathaniel SMITH.**

No. C–CR–86–25.

United States District Court, W.D. North Carolina, Charlotte Division.

July 31, 1986.

David Graham, Asst. U.S. Atty., Charlotte, N.C., for plaintiff.

Robert J. DeCurtins, Charlotte, N.C., for defendant.

### ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendant's Motion to Suppress evidence seized during a search of his baggage by State Bureau of Investigation Agent J.A. Davis and Charlotte Police Officer Donald Harkey at Charlotte's Douglas International Airport on February 25, 1986.

The Magistrate held an evidentiary hearing on Defendant's Motion on May 9, 1986, and on July 1, 1986 filed a Memorandum and Recommendation that Defendant's Motion to Suppress be allowed.

The Government, within the time allowed by the Court, filed a Memorandum on July 23, 1986 contending that the Motion to Suppress should be denied.

The Government apparently does not dispute the Magistrate's Findings of Fact and the Court sees no benefit in repeating those Findings of Fact here.

Based on the Findings of Fact by the Magistrate and the applicable law the Court will deny the Defendant's Motion to Suppress.

## DISCUSSION

The Magistrate concluded that Agent Davis' initial contact with the Defendant was consensual and did not amount to a "seizure". However, she then concluded on Page 13 of her Memorandum and Recommendation that Davis' initial contact with the Defendant subsequently escalated from a consensual encounter to a seizure because a person is seized when by means of *physical force or show of authority, his freedom of movement is restricted* (emphasis added). *United States v. Mendenhall*, 446 U.S. 544, at p. 553, 100 S.Ct. 1870, at p. 1876–77, 64 L.Ed.2d 497.

The Magistrate went on to say on pages 13 and 14:

Such restraint occurred in this case when Smith first noticed that he was being monitored by two airport police officers. At that point, Smith had completed his initial contact with Davis and had been informed that his suitcase would be detained for a "sniff test". Since Smith was clearly the focus of a criminal investigation, it was reasonable for him to conclude that the purpose of the surveillance was to prevent him from leaving the airport before the investigation was completed.

The Magistrate then stated on Page 15 of her Memorandum and Recommendation:

Indeed, the surveillance had nothing to do with the investigation and was, instead, a means of insuring that Smith was around to arrest if the investigation bore fruit. See n. 5, *infra* at 6.

Note 5 on page 6 stated:

Agent Davis testified that on a number of occasions in the past, drug courier suspects had avoided apprehension by leaving the airport while he was attempting to obtain a search warrant. According to Davis, he told the airport police to stay in Smith's "general vicinity" and to let him know if Smith got into a cab so he would know "where to start the trail of trying to track him."

The Magistrate then pointed out on page 15 that Davis had questioned Smith two more times. The Magistrate then concluded on Page 16 after citing *United States v. Ilazi*, 730 F.2d 1120, 1126 (8th Cir.1984); *United States v. Morin*, 665 F.2d 765, 769 (5th Cir.1982); and *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229:

Accordingly, the consent to search, which was given during this conversation and was very much a product of Smith's ongoing detention, must fail unless Smith's detention was justified by probable cause. See *Royer*, 460 U.S. at 507, 103 S.Ct. at 1329.

In order to find that Smith was detained without probable cause one would have to hold that the surveillance here is tantamount to seizure and that a reasonable person would have believed he was not free to leave. The avowed purpose of the surveillance as set out in Note 5 on page 6 of the Magistrate's Memorandum and Recommendation was to let Agent Davis know if Smith got into a cab so he would know where to start the trail of trying to track him.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses and papers, and effects against unreasonable searches and seizures shall not be violated ...."

It would be a long leap to hold that surveillance by police officers, even when in uniform, would constitute a seizure. A person is seized *only* (emphasis added) when by means of physical force or a show of authority, his freedom of movement is restrained. *United States v. Mendenhall*, 446 U.S. 544 (1980) at page 553, 100 S.Ct. 1870, at page 1876–77, 64 L.Ed.2d 497.

There is nothing in the Magistrate's Findings of Fact which indicates that the uniformed police officers approached the Defendant, touched the Defendant, spoke to the Defendant, or in any other way made a showing of authority which *would* cause a *reasonable* person to believe his freedom was restrained. The Defendant was free to go where he wanted to and even to leave the airport, and there is no finding of fact that the Defendant was in any way prevented by the police officers

from going anywhere he wanted to go while he was under surveillance.

To hold that surveillance of a suspect by uniformed police officers amounts to a seizure would lead to wholly unrealistic restrictions on police to pursue their legitimate law enforcement practices.

The case of *United States v. Morin*, 665 F.2d 765 (1982) is cited by the Magistrate for the proposition that successive stops of an individual based on the same information strongly indicate a finding that not just a detention but an arrest has taken place. The facts of that case were very different from the facts in the case at bar. In *Morin* the defendant was approached by a police officer who asked to speak with him when he deplaned at Dallas/Ft. Worth airport. When asked if he would allow a search of his luggage he agreed to a search of his carry-on bag but not to his checked luggage. A dog sniff test did not result in a clear indication that drugs were inside and Morin was allowed to board the plane to Austin. The officer in Dallas/Ft. Worth alerted law enforcement authorities of Morin's suspected criminal activity and when he deplaned in Austin, the officers followed him to a restroom. Quoting from page 767 of that opinion:

As defendant stood before a urinal in the otherwise empty restroom Wolsch stepped up to his right side, identified himself as a police officer and stated that he suspected defendant of carrying narcotics. He asked for identification, which Morin supplied *and Wolsch kept* (emphasis added). Defendant's airline ticket was also taken at this time. Wolsch was accompanied by three other plain clothes policemen, one of whom was standing on the other side of defendant and two others who were approximately ten to fifteen feet away. Wolsch told defendant that the officers wished to question him and asked him to accompany them to the airport police office. Officer Wolsch next inquired twice whether Morin had any luggage other than the carry-on bag which was next to him. He made this inquiry despite the fact that he knew the answer based on information from the Dallas law enforcement authorities. Defendant denied having any other luggage. He was then briefly frisked and taken to the airport police office, where he was subjected to a body search.

Cocaine was found in his checked bag and he moved to suppress the evidence on the ground that his verbal disclaimer of the luggage was tainted by an illegal arrest. His motion was denied by the district court and he was convicted at trial.

As the appellate court held in reversing the District Court, the defendant was literally caught with his pants down, surrounded by four officers, his airline ticket confiscated and he was searched.

Now *that* was a seizure, and is a far cry from the present case where as found by the Magistrate, the initial contact was consensual and did not amount to a seizure.

The second encounter with the Defendant occurred when Davis, while on the phone, noticed the Defendant walking toward him, motioned to the Defendant saying, "Excuse me, Mr. Smith, can I talk with you for a second?" The Defendant walked over to Davis and Davis asked him where he wanted his bag sent. This occurred in the public concourse and Defendant was not asked to accompany the officer anywhere.

Davis then asked the airport police to surveil the Defendant, *not to stop him*, but to let Davis know if the Defendant took a cab. The Defendant became aware of the surveillance.

Davis found Defendant's bag with telephone numbers attached which he determined had been disconnected. Davis then located the Defendant through the airport police, and asked the Defendant some additional questions concerning the telephone numbers Davis had found on Defendant's bag, which he had determined had been disconnected. Davis also asked the Defendant again where he wanted his bag sent. All of this conversation was conducted in the public concourse. Defendant was never asked to accompany Davis anywhere

and Davis left the Defendant in the public concourse.

After this third encounter with the Defendant, Davis went back to the Narcotics Interdiction Unit office where the narcotics detection dog had arrived. The dog did not alert, which caused Officer Harkey to suspect there may be explosives in the bag.

Thereafter, Agent Davis and Officer Harkey went back to the public concourse where Harkey introduced himself as an officer with the Charlotte Police Department, told the Defendant he was not under arrest and that he was seeking his cooperation. Officer Harkey then asked Defendant if there were any guns, explosives, contraband or controlled substances in his bag and Defendant replied, "I don't know what's in my bag." Harkey asked Defendant if he would consent to a search of his bag, and Smith said, "Do what you need to do. I don't know what's in my bag."

Considering this a consent, the officers searched the bag and found approximately a pound of cocaine. The Defendant was then located and arrested.

The first approach of the Defendant was consensual, the second approach was casual and for an important purpose, determining where to send the bag. The third approach was to determine additional information concerning why the telephone numbers on the bag had been disconnected. The fourth approach was to try to determine if there were any explosives in the bag to which the dog had not alerted.

All the approaches to the Defendant were in the public concourse. The Defendant was never asked to accompany the officers anywhere, except for the search on the initial encounter. The Defendant was repeatedly told that he was free to go and was not under arrest.

The airline ticket and identification were requested from the Defendant, not demanded, and were returned to him. The two officers who kept the Defendant under surveillance never approached him, never touched him, never spoke to him, or in anyway prevented the Defendant from moving about the airport, nor is there any factual finding that they intimated to the Defendant that his way would be blocked if he left the airport.

In conclusion, on all these facts the Court concludes that a reasonable person would not have believed that he was not free to go where he pleased including leaving the airport.

Therefore, the Court will deny the Defendant's Motion to Suppress.

NOW, THEREFORE, IT IS ORDERED that the Defendant's Motion to Suppress the evidence seized from his baggage be and it is hereby DENIED.

The Clerk is directed to certify copies of this Order to defense counsel and the United States Attorney.