DONOVAN, J., dissenting:
{¶ 59} I disagree. In protecting individuals from unreasonable searches and seizures, "the Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " Immig. &Naturalization Serv. v. Delgado , 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), quoting United States v. Martinez-Fuerte , 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Encounters between citizens and law enforcement officials *137 fall outside this Fourth Amendment protection when the encounter is inherently consensual in nature, in that a reasonable person would not feel compelled to respond or engage the officer "beyond the natural sense of obligation almost anyone would feel when a police officer begins asking questions." Guadalupe v. United States , 585 A.2d 1348, 1354 (D.C. App. 1991). "Action based merely on whatever may pique the curiosity of a particular officer is the antithesis of the objective standards requisite to reasonable conduct and to avoiding abuse and harassment." Martinez-Fuerte , 428 U.S. at 577, 96 S.Ct. 3074 (Brennan, J., dissenting).
{¶ 60} In my view, the second encounter between Officer Current and Ward constituted an acquiescent submission to a show of police authority, not a voluntary consensual encounter. In light of the facts in this case, the second encounter falls into the category of a second investigatory detention (" Terry stop"). The State concedes that Officer Current did not possess the requisite articulable reasonable suspicion of imminent criminal activity upon engaging Ward the second time. Furthermore, the first stop lacked any reasonable and articulable suspicion of criminal activity.
{¶ 61} As the majority notes, an encounter constitutes a "seizure," implicating the Fourth Amendment, when, in view of all the circumstances surrounding the encounter, a reasonable person would believe he or she was not free to leave. Mendenhall , 446 U.S. at 554, 100 S.Ct. 1870. Specifically, a "seizure" occurs when "the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded" to police questioning. Delgado , 466 U.S. at 216-217, 104 S.Ct. 1758.
{¶ 62} In situations involving a vehicular traffic stop, this court has noted that after an officer completes the purpose of the original stop, his "subsequent or simultaneous request to search [a] defendant's vehicle constituted an unlawful continued detention/seizure of [the] defendant, unless [the officer] possessed a reasonable suspicion that [the] defendant was engaged in some additional criminal activity" beyond that which constituted the reason for the initial stop. State v. Ferrante , 196 Ohio App.3d 113, 2011-Ohio-4870, 962 N.E.2d 383, ¶ 21 (2d Dist.). By analogy, this standard should apply to a pedestrian as well.
{¶ 63} In Retherford , we observed that:
We think that it strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel "free to leave" or "at liberty to ignore the police presence and go about his business," in spite of being told otherwise, when she is then asked investigatory questions by the officers and faced with a request to search her vehicle for contraband. We think that no reasonable person subjected to a traffic stop would feel free to walk away at any time when she is questioned about and confronted with the suspicion of drug trafficking. We agree that "statements by officers that individuals are suspected of smuggling drugs" are statements which "intimate that an investigation has focused on a specific individual [which] easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention."
(Citations omitted.) Retherford , 93 Ohio App.3d at 599, 639 N.E.2d 498. I emphasize, in this case, the officer had no reasonable suspicion of any criminal activity.
{¶ 64} As noted, the same concerns reasonably apply to individuals detained by an officer on the street, who are first questioned as to their identity, and then, after *138 the officer proceeds down the street apparently satisfied, are again stopped, asked if they are carrying illegal items on their persons, and asked if they will submit to a search. Obviously, "an individual's prior encounters with [ ] officers should be taken into consideration when determining whether an encounter was coercive or consensual," as successive encounters with police officers would suggest to a reasonable person that he or she is the target of an investigation, and therefore not free to leave. United States v. Beauchamp , 659 F.3d 560, 567 (6th Cir. 2011). Courts have acknowledged the "inherently more intrusive and coercive" nature of successive police encounters with an individual, particularly where the subsequent encounter is not justified by any additional information. See Guadalupe v. United States, 585 A.2d 1348 (D.C. App. 1991) ; United States v. Morin , 665 F.2d 765 (5th Cir. 1982) ; United States v. Ilazi , 730 F.2d 1120, 1126-1127 (8th Cir. 1984).
{¶ 65} Here, as both parties concede, Officer Current's initial encounter with Ward constituted a "consensual encounter," thereby not requiring any of the minimal reasonable suspicion necessary to justify any "seizure." During this first encounter, Officer Current, acting admittedly on a hunch that something was suspicious because he didn't recognize Ward, asked Ward a series of questions regarding who he was, what he was doing, and where he was going. Tr. 7. Further, Officer Current obtained from Ward his social security number, which was subsequently run through dispatch revealing no outstanding warrants. Tr. 27. Officer Current testified that Ward was fully cooperative and provided him with all the information he had requested. Id. After Officer Current had asked this series of questions, ostensibly satisfied, he disengaged with Ward and proceeded to drive off while Ward resumed walking down the sidewalk. Id. At this time, Ward should have been free to proceed uninterrupted from unwarranted police intervention.
{¶ 66} The second interaction between Officer Current and Ward, in my view, constituted a "detainment," thereby invoking Fourth Amendment protection. The circumstances surrounding the second engagement between Officer Current and Ward support a finding that a reasonable person would not have felt free to ignore Officer Current's reengagement and keep walking, nor would they have felt free to ignore Officer Current's unwarranted requests.
{¶ 67} After disengaging with Ward following the initial encounter, Officer Current then reengaged with Ward as Ward became parallel to Officer Current's parked cruiser while walking down the sidewalk on the opposite side of the street. Tr. 27. In contrast to their first encounter, Officer Current immediately got out of his cruiser. Id. Officer Current then called out to Ward, asking him if he had anything illegal on him. Id. It was at this point that Ward stopped walking and responded that he did not have anything illegal on him. Id. Officer Current testified that he then continued his approach upon Ward, asking him if he could "check" if Ward had anything illegal. Id. Ward initially responded "yes." Id.
{¶ 68} The majority holds that this second encounter was likewise a "consensual encounter." The majority notes that there was no use of physical force or show of authority by Officer Ward that would cause a reasonable person in Ward's position to not feel free to decline Current's requests or otherwise end the encounter, as Current did not "issue any orders" or "curtail Ward's freedom in any way" when he asked to conduct the search. Majority Opinion, ¶ 36.
*139 {¶ 69} However, in my view, the totality of the circumstances surrounding this successive encounter indicates that a reasonable person in Ward's position would not have felt free to ignore Officer Current's requests or otherwise disengage. Considering the short amount of time following the disengagement before Officer Current reengaged Ward, compounded with the enhanced nature of Officer Current's actions initiating this reengagement, including getting out of his cruiser, yelling across the street, asking inherently accusatory questions absent any reasonable and articulable suspicion of wrongdoing, and approaching Ward while continuing to ask questions, a reasonable person in Ward's position would not have felt free to simply ignore Officer Current's requests or walk away. The actions of Officer Current upon this reengagement strongly communicate the message that Ward would not be free to leave until Officer Current's curiosity was satisfied. In fact, the implicit message was that Ward was not entirely free to leave after the first encounter.
{¶ 70} These actions by Officer Current constituted a show of police authority that unequivocally restrained Ward's liberty and therefore implicated the Fourth Amendment. Any act of agreement or consent by Ward upon this successive engagement was not voluntarily and freely given, but constituted an acquiescence to a show of police authority that merely served as "an expression of futility in resistance to [such] authority." Beauchamp , at 572. The cumulative coercive effect of a reengagement under the circumstances of this case vitiated any consent to the encounter that Ward could have given.
{¶ 71} Because the State concedes that Officer Current did not have reasonable articulable suspicion to stop Ward, the second encounter between Officer Current and Ward, in my view, was an illegal seizure under the Fourth Amendment.
{¶ 72} The next issue was whether Ward's consent to Officer Current's search of his person was a valid waiver of Ward's constitutional rights against warrantless searches. See State v. Akron Airport Post No. 8975 , 19 Ohio St.3d 49, 51, 482 N.E.2d 606 (1985). "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." State v. Scarberry , 2016-Ohio-7065, 72 N.E.3d 173, ¶ 18, quoting Florida v. Royer , 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Regardless of whether the consent is given during a lawful or unlawful detention, courts must examine the totality of the circumstances in determining the voluntariness of the consent to the search. Robinette III , 80 Ohio St.3d 234, 685 N.E.2d 762, paragraphs two and three of the syllabus. "The totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." Id. , at paragraph three of the syllabus. When a person is lawfully detained, the State must show by clear and convincing evidence that his or her consent to search was freely and voluntarily given. Scarberry , at ¶ 19. However, when a person's consent to search is obtained after illegal police activity, such as an illegal seizure, the State must meet a more stringent standard. Id. at ¶ 20. Because "an illegal detention presumptively nullifies any consent that is a product of the detention," Ferrante at ¶ 28, the consent will be held voluntary "only if there is proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of the prior illegal action." Retherford at 602, 639 N.E.2d 498, citing *140 Royer at 501, 103 S.Ct. 1319. "Factors to consider in determining whether the consent is sufficiently removed from the taint of the illegal police activity include the length of time between the illegal activity and the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." State v. Alihassan , 10th Dist. Franklin No. 11AP-578, 2012-Ohio-825, 2012 WL 682883, ¶ 26.
{¶ 73} Because the trial court in this case found both encounters between Officer Current and Ward to be consensual, lawful encounters, the court did not make any specific findings concerning the voluntariness of Ward's consent to the search. Instead, as the majority notes, the court cited State v. Sears , 2d Dist. Montgomery No. 20849, 2005-Ohio-3880, 2005 WL 1797037, and stated simply that Ward's consent was voluntary because it "was not obtained by force, threat, or any claim that if consent had been denied, the patdown would have been conducted in any event." Tr. 51.
{¶ 74} However, Sears does not apply. Unlike the present case, we concluded in Sears that the detention for the patdown search was lawful, because the defendant's "furtive, suspicious movements inside the vehicle created a reasonable suspicion that he might be armed and posed a danger to the officers." Sears at ¶ 33. We found that the defendant's consent to the removal of spoons from his pocket was voluntary because the consent was not the product of physical force, a threat of physical force, or an assertion that the officer would, in any event, have lawful authority to remove the spoons. Id. at ¶ 37-39. In contrast, the search in this case was not conducted as a lawful search for weapons incident to arrest, as was the case in Sears . Moreover, the specific facts surrounding the consent to search in this case differ from those in Sears . Sears involved the defendant's consent to the removal of spoons, not the search of his person. Further, there was no allegation that the officers in Sears ever physically restrained the defendant upon requesting the consent at issue, whereas in this case, Officer Current testified to restraining Ward's arms behind his back until Ward eventually "allowed [him] to remove [the box-cutters]." Tr. 31.
{¶ 75} Accordingly, the circumstances surrounding Ward's consent to Officer Current's search of his person, in my view, support a finding that Ward's consent was invalid. The cumulative coercive effect of the successive engagement and Officer Current's increased assertiveness toward Ward would cause a reasonable person to believe that he or she could not reject the officer's request to search. Moreover, under the above-mentioned standards, Ward's consent to the search was not removed at all from the taint of the illegal detainment, and, in fact, occurred contemporaneously.
{¶ 76} Assuming, arguendo, that Ward's initial consent to the search of his person was valid, Ward subsequently withdrew that consent. See State v. Jacko , 2d Dist. Montgomery No. 24371, 2011-Ohio-6494, 2011 WL 6365143, ¶ 26 (noting that "[a] suspect may revoke his consent to a search or limit the scope of the search to which he consents."). An individual need not expressly revoke their consent, and may do so impliedly. Id. at ¶ 29. Here, Ward explicitly told Officer Current that he could not remove the box-cutters from his pockets, and it is clear that his consent to continue the unwarranted search was necessarily withdrawn at this point. The fact that Ward eventually "allowed" Officer Current to remove the box-cutters after Officer Current explained that it was for his safety does not indicate that any further consent at this point was voluntary or sufficiently removed from the detention.
*141 The majority states that at the time Officer Current asked to remove the box-cutters, "Current was entitled to do so for purposes of his own safety," and that "Current had a reasonable, articulable suspicion of criminal activity ... once he discovered the box-cutters." However, it is important to note that Officer Current testified that Ward had not done anything wrong/criminal prior to him finding the gel caps, and that if Ward had not allowed him to remove the box-cutters, Officer Current would have continued the patdown anyway. Also, the State concedes that there was no reasonable, articulable suspicion of criminal activity at this point, as Officer Current did not discover the gel caps until after removing the box-cutters from Ward's pockets. An inquiry from the trial court to Officer Current during the suppression hearing further establishes that there are no charges associated with the box-cutters, and Officer Current testified that he intended to return them to Ward upon the completion of the search. Tr. 31. Box-cutters are not a deadly weapon per se, and the State had absolutely no evidence they were possessed, used, or carried as a weapon, thus the presence of this common work tool does not constitute reasonable, articulable suspicion of any crime.
{¶ 77} Moreover, Ward was unquestionably seized at this point, as Officer Current physically took hold of Ward's arm and folded it back. A reasonable person would not feel free to decline the officer's request and walk away when physically restrained in this manner. Accordingly, there was no consent to continue the patdown beyond the point at which Officer Current asked to remove the box-cutters and physically restrained Ward.
{¶ 78} Finally, in my view, I would find that Ward did not voluntarily abandon the gel caps. This court has stated that "[w]hen a person disposes of or abandons property in response to illegal police conduct, such as an illegal seizure or search, that person is not precluded from challenging the admissibility of the evidence because his act of abandonment is not voluntary and is a product or fruit of that illegal police conduct." State v. Cosby , 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 32 (2d Dist.). "The test for voluntary abandonment involves a determination of whether the abandonment was a product of the illegal stop and seizure of defendant." Id. at ¶ 33. Here, Ward's abandonment of the gel caps was clearly in response to Officer Current's illegal search and seizure. Thus, I would hold that Ward did not voluntarily abandon the gel caps, and that they constitute products of Officer Ward's illegal police conduct. Accordingly, I would reverse.