[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10482
Non-Argument Calendar
_____

D.C. Docket No. 3:16-cr-00342-WKW-SRW-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ROBERTO ANGUIANO, III,

Defendant - Appellant.

_____

No. 18-10994
Non-Argument Calendar
_____

D.C. Docket No.  3:16-cr-00342-WKW-SRW-2

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

                    versus

MARIO VERDUZCO,

                                        Defendant - Appellant.

_____

Appeals from the United States District Court
for the Middle District of Alabama
_____

(November 1, 2019)

Before MARCUS, WILSON, and ANDERSON, Circuit Judges.


PER CURIAM:

In these consolidated cases, brothers Roberto Anguiano, III, and Mario

Verduzco appeal the district court's denial of their motions to suppress drug

evidence obtained following a traffic stop. Anguiano and Verduzco pleaded guilty

to conspiracy to distribute and possess with intent to distribute cocaine powder and

heroin, in violation of 21 U.S.C. §§ 841(a)(1), 846.[1]  They entered conditional

_____

[1] "Except as authorized by this subchapter, it shall be unlawful for any person knowingly
or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture,
distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). "Any person who attempts
or conspires to commit any offense defined in this subchapter shall be subject to the same penalties

2

guilty pleas pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure in which they reserved the right to appeal the denial of their motions to suppress.[2] On appeal, Anguiano and Verduzco argue that the district court erred in denying the motions to suppress because the traffic stop was unlawfully prolonged and the subsequent search of the vehicle was not authorized by valid consent or probable cause.  For the reasons that follow, we affirm.

## I.    BACKGROUND

In a superseding indictment, a grand jury indicted Anguiano, Verduzco, and two other defendants on one count of conspiracy to distribute and possess with intent to distribute cocaine powder and heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count of possessing with intent to distribute cocaine powder, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  Before trial, Anguiano and Verduzco each filed a motion to suppress evidence obtained from the traffic stop that led to their arrest.  They made a variety of arguments: the law enforcement officer who conducted the search lacked reasonable suspicion or probable cause to stop their truck, the officer unlawfully prolonged the traffic stop, the officer questioned them before giving them their Miranda rights, the officer's

---

as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

[2] "With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea." Fed. R. Crim. P. 11(a)(2).

initial search exceeded the scope of consent, the drug detection dog was unreliable, the second search exceeded the scope of consent, and there were insufficient facts for the officer to believe drugs were present.  A magistrate judge held a two-day hearing on the motions to suppress, in which the following evidence was presented.

A.  Kolbe's Testimony

Deputy Jason Kolbe of the Baldwin County, Alabama, Sheriff's Office testified that on July 7, 2016, while he was on duty on Interstate 65 in Baldwin County, he encountered a 2014 Toyota Tundra pickup truck.  Kolbe said that he noticed that the truck had a paper Texas tag that had been inserted in a plastic cover and explained that there may have been some condensation on the plastic that made the tag not visible at 50 feet behind the vehicle.  Kolbe initiated a traffic stop based on a violation of Ala. Code § 32-6-51, which Kolbe testified that he believed requires all tags to be visible from 50 feet behind the rear of the vehicle.[3] [*Id.*]  Kolbe testified that, after he turned on his lights, the truck continued traveling to the next exit located about a mile away.  At that point, the truck

---

[3] Ala. Code § 32-6-51 provides that "[e]very motor vehicle operator who operates a motor vehicle upon any city street or other public highway of or in this state shall at all times keep attached and plainly visible on the rear end of such motor vehicle a license tag or license plate as prescribed and furnished by the Department of Revenue at the time the owner or operator purchases his license."  Although this provision does not require specifically that the tag be visible from 50 feet behind the vehicle, Anguiano and Verduzco do not contest the legality of the initiation of the traffic stop.

"pulled off the interstate on the off ramp and into a parking lot of a BP gas station." Kolbe then approached the vehicle on the passenger side window and spoke to the driver. He noticed that there were four occupants inside the vehicle—the driver (Verduzco), a male passenger (Anguiano), and two female passengers in the back seat. Kolbe then asked the driver for his driver's license and registration, which the driver provided.

Kolbe testified that he began talking to the driver who told him that he was traveling from Laredo, Texas, to Montgomery, Alabama, for a family reunion. Kolbe asked if they had driven through the night or if they had stopped somewhere, and the driver responded that they had driven through the night. Kolbe testified that, in his experience, this is an indication of drug trafficking because traffickers tend to leave late at night and drive through the night due to a belief that there is less police presence on the interstate at that time. He also explained that he had noticed the driver showing signs of nervousness—his hands were shaking, and his breathing was heavy. Kolbe then invited the driver to sit in the patrol car with him while he completed his paperwork, and the driver did so. Kolbe then explained that he also was suspicious because he had noticed the truck had four occupants but only one suitcase in the bed of the pickup truck, which did not seem to him like enough luggage for four people, especially when two of them

5

were women.  At that point, Kolbe asked again about the group's travel plans, and the driver again stated that they were going to Montgomery for a family reunion.

Kolbe went back to the vehicle and spoke to the male passenger, Anguiano, who stated that they were going to Atlanta to hang out for a few days and maybe do some shopping.

Kolbe then went back to the patrol car and explained to the driver that the other passenger had said that they were traveling to Atlanta, not Montgomery. The driver said that they were going to both Montgomery and Atlanta because Montgomery is close to Atlanta. Kolbe testified that this was not true, believing "it's about four hours from Montgomery to Atlanta."  Kolbe then asked what they were planning to do in Atlanta, and the driver responded that he had friends in Atlanta and that he wanted to show them his new truck, which Kolbe thought was inconsistent with the driver's initial statement about a family reunion.  Kolbe testified based on his training and experience that the I-65 corridor from South Texas to Atlanta is a significant drug trafficking route.  Kolbe then testified that it was also significant that the truck was newly registered because drug organizations will give vehicles to mules and have them register the vehicle in their name in order to avoid using third-party vehicles.

Kolbe then testified that he asked the driver and male passenger for consent to search the vehicle based on his suspicions of drug trafficking.  Both gave

6

consent.  Kolbe testified that, during the search, he noticed rust on the frame of the rear bench passenger seat.  Kolbe stated that this rusting inside a newer, well-maintained vehicle indicated to him that the seat could have been taken out of the truck in order to hide contraband and that there might be a void in the back wall of the truck.  Kolbe then walked his drug detection dog around the vehicle.  The dog did not alert so Kolbe wrote a warning for the no-visible-tag violation and let the vehicle go.

Kolbe testified that two minutes after he let the truck go, he called Deputy Sheriff Rodney Arwood who worked in drug interdiction.  Kolbe said that he told Arwood about the stop and that, based on his conversation with the truck's occupants, he believed that they were engaged in drug trafficking.  Kolbe told Arwood what the passengers had told him and about his search of the truck.  He also told Arwood that he thought that during his search he may have missed something in either the back wall of the truck or the engine compartment.

B.  Arwood's Testimony

Arwood, a deputy sheriff in Chambers County, Alabama, testified that on July 7, 2016, he spoke to Kolbe who mentioned that he had stopped a vehicle and that the driver and passenger had given him conflicting stories.  Later that day, Arwood saw the same truck going below the speed limit on interstate 85. As he was following the truck, Kolbe observed the truck abruptly exit the interstate. A

few moments later, the truck reentered the interstate, and Arwood saw the truck move from the left lane into the right lane. As it did so, the truck drove onto the white line on the right side of the highway. Arwood testified that he then initiated a traffic stop because of the improper tag display—the tag was not readable due to condensation on the plastic covering—and the improper lane change.

Arwood stated that he approached the truck and asked the driver, Anguiano, for his driver's license and vehicle information. Arwood testified that the driver's hands were visibly shaking as he handed him a piece of paper that Arwood recalled as being either the bill of sale or "maybe the insurance." Anguiano did not have a driver's license and explained that they had recently switched drivers, indicating that Verduzco had previously been driving. Verduzco, Arwood explained, also appeared nervous when he handed Arwood a paper photocopy of his driver's license. Arwood testified that he conveyed the information to dispatch but that there was a delay in dispatch's response. Arwood testified that he spoke to Kolbe to let him know that he had stopped the vehicle but that he did not recall what exactly they discussed. Arwood stated that he waited for the arrival of Officer Lawrence Howell of the City of Valley, Alabama, Police Department to serve as backup. Arwood stated that he requested backup out of safety concerns since there were three people in the truck other than the driver.

8

Arwood testified that once Howell arrived, he asked Anguiano to sit in the front seat of his patrol car and write his name and date of birth. Arwood asked Anguiano about his travel plans, and Anguiano explained that he was going from Laredo, Texas, to Atlanta on a trip to surprise his girlfriend. Arwood asked what attractions they were going to see in Atlanta, and Anguiano said that they had no specific attraction in mind and asked for a recommendation. Arwood testified that he found that odd because "Laredo is 15 to 16 hours away," and "[t]hat just seemed like a long way to drive to have no set destination, to have no travel plans already in place." Arwood testified that he also thought it was strange that there was only one suitcase in the truck for four people and that he recalled Anguiano explaining that he brought two sets of clothing but that he was going to shop in Atlanta. Anguiano testified that he asked Anguiano whether they had made any recent stops and that Anguiano said they had stopped to fuel up. Arwood said that Anguiano mentioned that they had been stopped by the police several hours ago and that the truck has been searched. Arwood testified that he expressed to Anguiano that he was a little suspicious as well. About 30 minutes into the stop, Arwood asked for consent to search. After that, he gave Anguiano a warning ticket for the traffic violation.

Arwood testified that he then asked Verduzco the same questions about where they were going and also asked Verduzco for consent to search. According

to Arwood, Verduzco said that they were going to Atlanta to surprise their girlfriends and that they would turn around and come straight back. Arwood asked about the luggage, and Verduzco said that Anguiano did not bring any clothes but that the girls brought some clothes and that they also planned to shop. Arwood found this suspicious because it did not match Anguiano's story. Arwood then searched the vehicle himself and had Howell walk his drug detection dog around the truck.[4] The dog alerted to the presence of drugs, and the truck was then taken to a mechanic's shop at a car dealership.

C. The Dash Cam Video

The government entered into evidence videos from the dash camera of Arwood's patrol car, which recorded the second stop. The video shows, in relevant parts, the following events. Arwood called in the license plate number before walking to the passenger side of the truck. He told the passenger that when the truck moved over to a different lane it went over the white line. Arwood then asked for the driver's identification and car registration. The driver responded that he was only driving to help out his brother and that he did not have a license. After receiving the documents, the video shows that Arwood went back to his patrol car

---

[4] Ricky Farley of the Alabama K-9 Law Enforcement Officer's Training Center testified as to the second drug detection dog's training and certification. The particulars of Farley's testimony are irrelevant to this appeal because Anguiano and Verduzco do not contest the dog's training or certification, nor do they contest that the dog alerted to the presence of drugs in their truck.

10

and, at the 3:40 minute mark, had a phone conversation with Kolbe.[5]  Arwood mentioned that a different person was driving and asked if Kolbe had noticed the gap between the back bumper and the tailgate.  At minute 6:00, Arwood radioed dispatch, which did not answer.  At minute 7:34, Arwood got in touch with dispatch and relayed the information he had received.

At minute 9:43, Howell arrived.  Arwood then discussed with Howell where the drugs might be, that the driver did not have a license, that there were only two pieces of luggage, that the truck exited abruptly, and that the individuals in the truck were acting "shady."  Arwood stated that he would ask for consent to search but, if they refused to consent, Arwood would still run the drug detection dog on the truck because Kolbe had said that he thought he missed something.  Arwood also mentioned that, in addition to suspecting drug trafficking, he also suspected sex trafficking.  During the conversation, at minute 10:02, dispatch interrupted with the truck's tag information.  Arwood finished briefing Howell at minute 14:51, and both Arwood and Howell approached the truck.

Arwood then had the driver, Anguiano, sit with him in the patrol car while Howell stood outside the truck keeping an eye on the passengers.  Arwood asked Anguiano to write down his name, date of birth, and social security, and asked how long they would be in Atlanta and how long it had taken them to drive from

---

[5] The times refer to the time codes on the dash cam video.

Laredo.  At minute 17:56, Arwood called dispatch to relay Anguiano's

information.  At approximately minute 23:00, Arwood began writing up the traffic

warning.  During this time, Anguiano asked if Arwood had been busy and about

things to do in Atlanta.  Arwood responded that they had been busy because there

had been a number of accidents and suggested the aquarium and Six Flags as

places to go in Atlanta.  Anguiano laughed and said that they had a Six Flags in

Texas.  Anguiano asked if it was a "big deal" to only have a paper tag, and they

talked about how paper tags could be easily forged.  Anguiano also brought up the

previous stop in Alabama and talked about the weather in Alabama versus Laredo.

At minute 28:54, Arwood asked for and received consent to search the truck.

At minute 31:10, Arwood explained that he had written Anguiano a warning and

advised him to be careful driving over the lines.  Anguiano explained that he had

taken over for his brother because he had been driving all night.  At minute 38:05,

Arwood began searching the truck.  At the 1:01:20 mark, Howell took his drug

detection dog around the truck, and at the 1:04:28 mark the dog alerted.  Arwood

told Anguiano that there was probable cause to further search the truck because of

the dog's alert and that they would be taking the truck to a mechanic where the

seats could be removed.

### D. The District Court's Decision

After the hearing, the magistrate judge issued a report and recommendation suggesting that the district court deny the motions to suppress. The magistrate judge determined that Arwood did not impermissibly prolong the stop because he had an independent, articulable, reasonable suspicion for doing so. The district court adopted the magistrate judge's report and recommendation and denied the motions to suppress. On February 1, 2018, Anguiano and Verduzco both pleaded guilty to one count of conspiracy to distribute and possess with the intent to distribute cocaine powder and heroin, reserving the right to appeal the denial of the motions to suppress. Anguiano and Verduzco timely appealed on February 7, 2018.

## II. STANDARD OF REVIEW

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts de novo." United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011) (quoting United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000)). We construe all facts in the light most favorable to the government as the party that prevailed in the district court. United States v. Lewis,

674 F.3d 1298, 1303 (11th Cir. 2012).  "[W]e afford substantial deference to the factfinder's credibility determinations."  Id.

## III.  DISCUSSION

Anguiano and Verduzco argue that the traffic stop and subsequent search violated their Fourth Amendment rights because (1) Arwood unlawfully prolonged the traffic stop beyond its mission, (2) the search of the truck was not authorized by valid consent or probable cause, and (3) Arwood's stop should be subject to heightened scrutiny because it was a successive stop.

### A.  Applicable Fourth Amendment Standards

The Fourth Amendment provides a right "against unreasonable searches and seizures."  U.S. Const. amend. IV.  A traffic stop is a "seizure" within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809–10 (1996). For a traffic stop to comply with the Fourth Amendment, the officer must have "reasonable suspicion" of criminal activity.  Heien v. North Carolina, 135 S. Ct. 530, 536 (2014).  In other words, the officer must have "a particularized and objective basis for suspecting the person stopped of criminal activity."  Navarette v. California, 572 U.S. 393, 396 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981)).

Even stops initially supported by reasonable suspicion, however, may violate the Fourth Amendment if the officer "diverts from the stop's purpose and adds

14

time to the stop in order to investigate other crimes" without reasonable suspicion therefor. United States v. Campbell, 912 F.3d 1340, 1353 (11th Cir. 2019) (describing the standard emanating from Rodriguez v. United States, 135 S. Ct. 1609, 1614–16 (2015)). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." Rodriguez, 135 S. Ct. at 1614 (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id.

The mission of the traffic stop includes "ordinary inquiries incident to [the traffic] stop." Id. at 1615 (quoting Caballes, 543 U.S. at 408). Those ordinary inquiries typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. They also include questions about travel plans. Campbell, 912 F.3d at 1354. The officer may also take "negligibly burdensome precautions" that are necessary to complete the stop safely. Rodriguez, 135 S. Ct. at 1616. What the officer may not do is extend the duration of the stop in order to investigate other crimes. Campbell, 912 F.3d at 1353.

As this standard suggests, the officer may lawfully extend the stop if he has an objectively reasonable and articulable suspicion that illegal activity has

15

occurred or is occurring.  Rodriguez, 135 S. Ct. at 1615; accord United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007).  In determining whether the extension of a stop is justified by reasonable suspicion of criminal activity, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Cortez, 449 U.S. at 417).  "A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity.  Among those factors that have justified further questioning are having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination."  United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999) (quoting United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998)).  Other factors include "driving with a suspended license" and "reluctance to stop."  Id.

If a stop is unlawfully prolonged without reasonable suspicion in violation of the Fourth Amendment, any evidence obtained as a result of that constitutional violation must generally be suppressed. See Wong Sun v. United States, 371 U.S. 471, 484–85 (1963).

B.  Whether Arwood Unlawfully Prolonged the Stop

Anguiano and Verduzco argue that Arwood prolonged the stop unlawfully by engaging in four departures from the mission of the traffic stop that added a

16

total of 16 minutes to the length of the stop. In considering this argument, we must first decide whether Arwood prolonged the stop beyond its mission and then whether the extended stop was nonetheless lawful because it was authorized by reasonable suspicion. See Rodriguez, 135 S. Ct. at 1615.

   i.  Whether Arwood Extended the Stop Beyond Its Mission

Anguiano and Verduzco argue that Arwood made four departures from the mission of the traffic stop: (1) when he called Kolbe about the first traffic stop, (2) when he waited in his car for Howell to arrive, (3) when he sat in the patrol car talking to Howell, and (4) when he talked to Anguiano while writing the traffic warning. We address each in turn.

First, Anguiano and Verduzco argue that Arwood extended the stop by talking on the phone to Kolbe from minute 2:37 to minute 6:00. They argue that because this conversation related to Kolbe's suspicion of drug smuggling and not the improper lane change, the conversation prolonged the stop. However, Arwood talked to Kolbe while he was waiting for Howell to arrive as backup in order to protect his safety. Given that there were four individuals in the truck, it was reasonable for Arwood to request backup. And "negligibly burdensome precautions" that are necessary to secure officer safety do not unlawfully extend a traffic stop. See Rodriguez, 135 S. Ct. at 1616. Further, Arwood's conversation with Kolbe—even though it concerned Kolbe's suspicion of drug smuggling—did

not add time to the stop because Arwood would have spent that time waiting for backup in any event. See Campbell, 912 F.3d at 1353 (explaining that "to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) *that adds time to the stop* (3) without reasonable suspicion" (emphasis added)).

Second, Anguiano and Verduzco argue that Arwood prolonged the stop from minute 7:34 to minute 9:43 when he waited in his car for backup to arrive. Anguiano and Verduzco argue that this pause cannot be justified by the need to protect officer safety because Arwood had already spoken with Kolbe. We disagree. Even assuming that Kolbe told Arwood that the truck's occupants did not have weapons and were non-violent when he encountered them (it is not clear from the record that he did), Arwood would not be required to abandon reasonable safety precautions on that basis. The truck's occupants could have obtained a weapon or become violent in the interim. Accordingly, it would be unreasonable to require Arwood to conduct a traffic stop with four people in the stopped vehicle without backup. See Terry v. Ohio, 392 U.S. 1, 23 (1968) ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.").

Third, Anguiano and Verduzco argue that the pause from minute 10:18 to minute 14:51 departs from the mission of the stop because Arwood and Howell sat

18

in Arwood's patrol car discussing what had happened during the stop and possible options for searching the truck to determine if it was being used for drug trafficking. The government contends that this portion of the stop was justified by the need for Arwood to give Howell the full context of the stop in order to protect officer safety. However, while the government argues that briefing Howell helped ensure officer safety, it concedes that Arwood and Howell also discussed strategy for searching the vehicle for evidence of a different crime from that which gave rise to the stop—drug trafficking (or possibly sex trafficking). See Rodriguez, 135 S. Ct. at 1616 ("On-scene investigation into other crimes . . . detours from [the mission of the stop].").  Anguiano and Verduzco are thus correct that Arwood prolonged the stop during this period of time.

Fourth, Anguiano and Verduzco argue that Arwood departed from the mission of the stop by talking to Anguiano while he was writing up the traffic warning from minute 23:16 to minute 28:54.  We recently rejected a similar argument—that an officer prolonged a stop unlawfully "by looking [the driver] in the eye while conversing with him rather than exclusively focusing on writing the ticket."  Campbell, 912 F.3d at 1353. We explained that "Rodriguez does not prohibit all conduct that in any way slows the officer from completing the stop as fast as humanly possible."  Id.  It prohibits only conduct "aimed at investigating

19

other crimes . . . that adds time to the stop." Id.[6] The conversation was not aimed at investigating other crimes. In fact, it was entirely initiated by Anguiano, who asked Arwood about things to do in Atlanta and whether it was a problem to only have a paper license plate. It would go well beyond the scope of Rodriguez to conclude that the Fourth Amendment requires an officer to ignore a person's attempts at making polite conversation while writing a traffic warning.

ii.  Whether Arwood Was Nevertheless Justified in Extending the Stop Based on a Reasonable Suspicion of Criminal Activity

Having determined that Arwood extended the stop beyond its mission when he discussed with Howell his suspicions of drug trafficking, we next assess whether Arwood was nonetheless justified in extending the seizure based on a reasonable suspicion of criminal activity. The government argues that Arwood had reasonable suspicion based on the fact that the truck abruptly exited the freeway, Anguiano and Verduzco appeared nervous, Arwood observed only one piece of luggage for four people, and Anguiano was driving without a license.[7]

---

[6] Of course, the officer could be so slow in performing tasks related to the traffic stop that he is no longer reasonably diligent, id. at 1353 n.14, but we do not conclude that Arwood took an unreasonable amount of time to write the warning, particularly given that the dash cam video confirms it was Anguiano, not Arwood, who initiated the conversation.

[7] While Arwood stated on the dash cam video that the truck contained two pieces of luggage, his testimony at the suppression hearing indicates that there was only one piece of luggage. The district court found based on Government's Exhibit 7, a contemporaneous photograph of the bed of the truck, that there was only one piece of luggage. We do not conclude that the factual finding that there was only one piece of luggage is clearly erroneous.

Even under <u>Rodriguez</u>, an officer may extend a traffic stop if he has a reasonable suspicion of criminal activity.  135 S. Ct. at 1615.  This Court has explained that among the factors that may contribute to reasonable suspicion are "having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination," as well as "driving with a suspended license" and "reluctance to stop."  <u>Pruitt</u>, 174 F.3d at 1220 (quoting <u>Hunnicutt</u>, 135 F.3d at 1349).  Here, Arwood observed several of these factors: he had observed the truck abruptly exit the freeway in front of him, he noted that Anguiano and Verduzco appeared nervous, he saw that there was only one piece of luggage for four people, and he knew that Anguiano was driving without a valid license.  Moreover, Arwood knew from Kolbe that the truck had started in Laredo, Texas, and was headed to Atlanta, Georgia, which Arwood testified is a common drug trafficking route.  He also knew that Anguiano and Verduzco had provided conflicting statements about their travel plans, and that Kolbe had observed a rust build-up on the rear seat. Thus, Arwood had reasonable suspicion of illegal activity that justified prolonging the stop.

Anguiano and Verduzco argue that, under the Tenth Circuit's decision in <u>United States v. Peters</u>, 10 F.3d 1517 (10th Cir. 1993), Arwood's reasonable suspicion cannot be based on information told to him by Kolbe.  Of course, we are not bound by any decisions rendered by the Tenth Circuit, and merely look to our

sister circuits' opinions as persuasive authority.  We need not decide whether to adopt the Tenth Circuit's rule it announced in Peters.  Anguiano's and Verduzco's argument that Peters shows that Arwood lacked reasonably suspicion fails for three reasons.  First, Arwood witnessed an independent traffic infraction that gave rise to his initial stop.  Second, even if we read Peters to prohibit the extension of a second stop based exclusively on grounds already exhausted by the first stop, Arwood did not rely *exclusively* on information conveyed to him by Kolbe.  At the moment that Arwood extended the stop, he had observed the truck make an abrupt exit from the freeway, he noted Anguiano and Verduzco's nervousness, he knew that the group had driven 16 hours through the night without any apparent reason for doing so, he noted the existence of only one piece of luggage for four people, and he knew that Anguiano had been driving without a valid license.  These grounds provided independent grounds—separate from any information gleaned from Kolbe—that were sufficient to extend the stop.  Third, neither Kolbe nor Arwood relied exclusively on nervous behavior as a cause for suspicion of illegal activity; rather, nervous behavior in both cases combined with other factors to give rise to a reasonable suspicion.  Accordingly, even when we compare this case to Peters, the "totality of the circumstances" still supports the conclusion that Arwood had "a particularized and objective basis for suspecting legal wrongdoing."  See Arvizu, 534 U.S. at 273.

22

In conclusion, for the reasons outlined above, Arwood had authority to extend the stop based on his reasonable suspicion of drug trafficking. Accordingly, Anguiano and Verduzco's argument that the drug evidence must be suppressed because it resulted from the stop fails.  See Wong Sun, 371 U.S. at 484–85.

C.  Whether the Search of the Truck Was Authorized by Valid Consent or Probable Cause

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).  Since Arwood did not have a warrant to search the truck, the search is unlawful unless one of the specifically established exceptions to the warrant requirement applies.  There are two exceptions implicated here. The first exception provides that a search is lawful even absent a warrant and probable cause if the search "is conducted pursuant to consent."  Id. The second exception implicated here is known as "the automobile exception." See Maryland v. Dyson, 527 U.S. 465, 467 (1999).  "[T]he automobile exception" provides that "'[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the

23

vehicle without more.'"  Id. (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)).

Anguiano and Verduzco argue that their consent to search the truck was invalid as it was given involuntarily due to the inherent heightened coercion of the successive stop.  Thus, we ask whether, under the totality of the circumstances, the consent was voluntarily given.  See United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001).  In undertaking that inquiry, we consider "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found."  Id.  There is no evidence that Arwood threatened force or violence or that he was verbally abusive.  There is no indication on the videotape that Anguiano or Verduzco were intimidated into consenting to the search or that they did not understand that they could refuse consent.  Anguiano and Verduzco thus both gave voluntary consent to search the truck.

Anguiano and Verduzco next argue that taking the truck to a car dealership to have it disassembled exceeded the scope of any consent that Anguiano and Verduzco gave to search the truck.  The problem for Anguiano and Verduzco is that probable case for an extensive search arose while the search was limited to the scope for which they argue.  That probable cause developed when the drug

24

detection dog alerted to the odor of drugs at the back seat.[8]  The drug detection

dog's alert gave Arwood probable cause to believe that the vehicle contained

drugs.  See United States v. Tamari, 454 F.3d 1259, 1265 (11th Cir. 2006) ("We

have long recognized that 'probable cause arises when a drug-trained canine alerts

to drugs'" (quoting United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993))).[9]

Arwood was thus authorized under the automobile exception to the warrant

requirement to conduct a more extensive search of the truck because "the truck was

operational and  [he had]  probable cause to believe that the vehicle contained

evidence of a crime."  Id. at 1264.  Therefore, the search of the truck at the

dealership did not violate the Fourth Amendment even if the search fell outside the

scope of Anguiano and Verduzco's consent.

D.  Whether Arwood's Stop Was Unlawful Because It Was a Successive Stop

Anguiano and Verduzco argue that this Court should consider the duration

of Kolbe's stop and Arwood's stop together in order to deter gamesmanship by

police.  They further insist that we apply heightened scrutiny to Arwood's stop

merely because it was a second stop.  Anguiano and Verduzco recognize that this

Court has not adopted either principle but argue that this Court should adopt such a

---

[8] Anguiano and Verduzco do not contend that the use of the drug detection dog exceeded the scope of their consent.

[9] As already noted, Anguiano and Verduzco do not contest that the dog was properly trained in drug detection or that the dog alerted to the presence of drugs.

25

rule based on four decisions from other circuits. According to Anguiano and Verduzco, those decisions recognize the inherent coerciveness of successive stops, which requires application of some level of heightened scrutiny.[10] We address each of the decisions advanced by Anguiano and Verduzco in turn.

In United States v. Foreste, 780 F.3d 518 (2d Cir. 2015), the Second Circuit was confronted with the question of "whether the reasonableness of the investigations' scope and duration should be evaluated individually or in combination" when there are two traffic stops. Id. at 525. The court concluded that "[b]ecause independent grounds for suspicion of criminal activity justified the extension of each stop, the reasonableness of the investigations' scope and duration should be evaluated separately." Id. at 526 (footnote omitted). The court then determined that the duration of each stop, 40 and 22 minutes respectively, was reasonable. Id. at 526–27. Foreste was decided in March 2015, one month before the Supreme Court issued its decision in Rodriguez. Rodriguez held that whether a stop has been unlawfully prolonged does not depend on the reasonableness of the total length of the stop but on whether the officer departs from the mission of the stop. See 135 S. Ct. at 1615–16. So, under Rodriguez, it does not matter whether

---

[10] It is not clear precisely what type or level of heightened scrutiny Anguiano and Verduzco would like us to apply.

we consider the stops together or separately. The stop is unlawfully prolonged if the officer at any time departed from the mission of the stop.

The Fifth Circuit has held that a second stop that was conducted under coercive circumstances constituted an arrest requiring probable case. United States v. Morin, 665 F.2d 765, 769 (5th Cir. 1982). In Morin, law enforcement officers stopped the same defendant in the Dallas/Fort Worth airport and then in the Austin airport. At the Austin airport, four officers surrounded the defendant in a public restroom. Id. at 767–68. The Fifth Circuit concluded that the stop constituted an arrest based on the heightened coercion of the circumstances, including the fact that there were two stops. Id. at 769. The Eighth Circuit has agreed with the Fifth Circuit's conclusion in Morin that successive stops are inherently more coercive. United States v. Ilazi, 730 F.2d 1120, 1125–26 (8th Cir. 1984). But the court concluded in Ilazi that, because the second stop did not otherwise exhibit the intrusive and coercive characteristics of an arrest, it did not exceed "permissible bounds *merely* because it was a second stop." Id. at 1126.

As stated previously, we are not bound by Morin or Ilazi. Moreover, we do not find that they support Anguiano and Verduzco's argument. The court in Morin looked to the totality of the circumstances in order to determine that the stop constituted an arrest. Although the court noted that the successive nature of the stop added to its coerciveness, the court principally relied on the fact that the

27

suspect "was literally caught with his pants down" when four law enforcement officers surrounded him in a public restroom.  See Morin, 665 F.2d at 769.  Anguiano and Verduzco were not subjected to anything close to that level of coercion.  Ilazi illustrates as much because in that case the Eighth Circuit distinguished Morin specifically on the grounds that there were no indicia of coercion aside from the successive nature of the stop.  Thus, Ilazi and Morin do not provide any support to Anguiano and Verduzco's argument that the second stop amounted to an unlawful arrest.

Finally, Anguiano and Verduzco cite United States v. Gorman, 859 F.3d 706, 714 (9th Cir. 2017), which is the only post-Rodriguez successive stop decision they cite.  In Gorman, the Ninth Circuit found that evidence seized pursuant to a second stop was properly suppressed under the exclusionary rule because it was the fruit of a first stop that was unlawfully prolonged.  859 F.3d at 714 (citing Wong Sun, 371 U.S. at 487–88).  That case is a straightforward application of the "fruit of the poisonous tree" doctrine—a doctrine that is inapplicable here because Anguiano and Verduzco do not argue the first stop violated their constitutional rights and we did not conclude that the second stop was unlawfully prolonged such that it would taint any subsequent search.

Contrary to Anguiano and Verduzco's argument, these decisions do not establish any general rule that successive stops, as such, are subject to heightened

28

scrutiny.  Nor do they alter our conclusion that Arwood had reasonable suspicion to extend the traffic stop to investigate potential drug crimes.

## IV.  CONCLUSION

Because we conclude that Arwood had reasonable suspicion to prolong the stop and the search of the truck was authorized by valid consent and probable cause, we affirm Anguiano and Verduzco's convictions.

AFFIRMED.